IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| HOME BUILDERS ASSOCIATION OF NORTHERN CALIFORNIA<br>200 Porter Drive, #200<br>San Ramon, California 94583<br><br>CALIFORNIA BUILDING INDUSTRY ASSOCIATION<br>712 Twelfth Street<br>Sacramento, CA 95814<br><br>BUILDING INDUSTRY LEGAL DEFENSE FOUNDATION<br>1330 S. Valley Vista Drive<br>Diamond Bar, California 91765<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE<br><br>H. DALE HALL, Director of the United States Fish and Wildlife Service, in his official capacity,<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR<br><br>LYNN SCARLET, Acting Secretary of the United States Department of the Interior, in her official capacity,<br><br>　　　　Defendants[1] | Civil Action No._____<br><br>CASE NUMBER 1:06CV00932<br><br>JUDGE: Richard W. Roberts<br><br>DECK TYPE: Administrative Agency Review<br><br>DATE STAMP: 05/17/2006 |

**COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF**

1.  Plaintiffs seek declaratory judgment and injunctive relief against Federal Defendants for violating statutory law. Defendant's listing of the central "distinct population segment" of the California Tiger Salamander (Central DPS) as a threatened species is not warranted and is an abuse of discretion. Defendants failed to use the best available scientific data, applied the wrong legal standard to determine threatened status, failed to provide adequate explanation for its listing determination, and improperly relied on presumed historical habitat

---

[1] The address for all Defendants is 1849 C. Street, NW, Washington, DC 20240

1

losses. Therefore, the final rule listing this species violates the Endangered Species Act (ESA) (16 U.S.C. § 1531, *et seq.*) and the Administrative Procedure Act (APA) (5 U.S.C. § 551, *et seq.*) and requires vacatur.

## JURISDICTION AND VENUE

2.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); § 1346(a)(2) (civil action against the United States); § 2201 (authorizing declaratory relief); § 2202 (authorizing injunctive relief); 16 U.S.C. § 1540(c) and (g) (actions arising under the ESA); and 5 U.S.C. § 702 (providing for judicial review of agency action under the APA).

3.  On August 30, 2004, more than 60 days before the filing of this complaint, Plaintiffs provided the Secretary of Interior written notice of the violations that are the subject of this lawsuit in accordance with 16 U.S.C. § 1540(g)(2)(C). The notice is attached as Exhibit 1 and is incorporated herein by reference. Defendants have not responded to this notice or taken any action to withdraw the final rule at issue here, or to otherwise remedy their violations of law.

4.  Venue in this district is predicated upon 5 U.S.C. § 703, and 28 U.S.C. § 1391(e), in that Defendants reside in this district and/or a substantial part of the events or omissions giving rise to this claim occurred in this district.

## PARTIES

### Plaintiffs

5.  Plaintiff Home Builders Association of Northern California (HBANC) is a nonprofit corporation and association of builders, contractors, and related trades and professions involved in the residential construction industry. HBANC represents the interests of its members and the residential construction industry in northern California, including owners and developers

of land within the habitat areas of the Central DPS. The ability of many of these owners and developers to productively use their land has been or will be constrained by the listing of the species. Because of the listing of the Central DPS, HBANC members are injured by reduced property values, delays or denials in loan approvals, delays or denials in permit approvals, and increased regulatory burdens including, but not limited to, study costs, mitigation fees, design changes, permit fees, and consulting costs. Vacatur of the listing of the Central DPS will alleviate these injuries.

6. Plaintiff California Building Industry Association (CBIA) is a state-wide trade association representing nearly 6,000 businesses—homebuilders, remodelers, subcontractors, architects, engineers, designers, and other industry professionals. CBIA-member companies employ approximately 500,000 people and generate nearly $69 billion a year to the California economy. CBIA works to ensure affordable housing for all Californians and to make up the shortfall of over 1 million new homes over the past decade. The ability of many of these industry professionals to practice their trade has been or will be constrained by the listing of the species. The listing of the Central DPS has increased the price of housing in the state by hindering building in the Central DPS habitat areas and has contributed to this shortfall in affordable housing. This has injured the building industry by reducing the opportunity to build affordable dwellings. Further, CBIA members work throughout the State of California including within the Central DPS habitat areas. Because of the listing of the species, their operations in the Central DPS habitat areas are hindered by (and they are injured by) reduced property values, delays or denials in loan approvals, delays or denials in permit approvals, and increased regulatory burdens including, but not limited to, study costs, mitigation fees, design changes,

permit fees, and consulting costs. Vacatur of the listing of the Central DPS will alleviate these injuries.

7. The Building Industry Legal Defense Foundation (BILD) is a California nonprofit corporation dedicated to defending and advocating the legal rights of property owners and housing providers throughout California. BILD is a wholly owned subsidiary of the Building Industry Association of Southern California, Inc., which has over 1,950 member companies related to the construction industry throughout the southern California region, including owners and developers of land within the Central DPS habitat areas. The ability of many of these owners and developers to productively use their land has been or will be constrained by the listing of the species. Because of the listing of the species, their operations in the Central DPS habitat areas are hindered by (and they are injured by) reduced property values, delays or denials in loan approvals, delays or denials in permit approvals, and increased regulatory burdens including, but not limited to, study costs, mitigation fees, design changes, permit fees, and consulting costs. Vacatur of the listing of the Central DPS will alleviate these injuries.

**Defendants**

8. Defendant Department of the Interior is an agency of the United States. Congress has charged the Department with administering the ESA for nonmarine species.

9. Defendant Lynn Scarlett is Acting Secretary of the Department of the Interior. She oversees the Department's administration of the ESA and is sued in her official capacity.

10. Defendant Fish and Wildlife Service (Service) is an agency of the Department of the Interior. The Service has been delegated responsibility by the Secretary of the Department of

the Interior for the day-to-day administration of the ESA, including the listing of threatened and endangered nonmarine species.

11. Defendant H. Dale Hall is the Director of the United States Fish and Wildlife Service. He oversees the Service's administration of the ESA and is sued in his official capacity.

12. All of these Defendants are responsible for the violations alleged in this complaint.

## LEGAL FRAMEWORK

### Listing of Threatened or Endangered Species

13. Before a species receives full protection under the ESA, it must be listed as "threatened" or "endangered." A "species" includes "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). A "threatened" species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). An "endangered" species is one "which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).

14. A species will be listed when the Secretary of Interior, acting through her delegates, promulgates a regulation that she has determined that a species is threatened or endangered because of any one of five factors:

    (A) the present or threatened destruction, modification, or curtailment of [the species] habitat or range;

    (B) overutilization for commercial, recreational, scientific, or educational purposes;

    (C) disease or predation;

    (D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting [the species'] continued existence.

16 U.S.C. § 1533(a)(1).

15. The listing determination must be made solely on the basis of the "best scientific and commercial data available" and only after the Secretary takes into account

> those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction; or on the high seas.

16 U.S.C. § 1533(b)(1)(A).

16. Economic or other factors may not be considered in making a listing determination.

17. A listed species is protected by Section 9 of the ESA, which, among other things, makes it unlawful for any person to "take" such species. *See* 16 U.S.C. § 1538(a)(1)(B). By its terms, the "take" prohibition applies only to "endangered" species. However, Section 4(d) authorizes Section 9 protections for "threatened" species if promulgated by rule. *See* 16 U.S.C. § 1533(4)(d). The government has adopted such a rule, thereby extending the "taking" prohibition to all listed species whether "threatened" or "endangered." *See* 50 C.F.R. § 17.3 (2001).

18. The term "take" under the ESA means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

19. The term "harm" in the definition of "take" means "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

**FACTUAL ALLEGATIONS**

20. On February 26, 1992, the United States Fish and Wildlife Service received a petition to list the California Tiger Salamander.

21. On November 19, 1992, the Service issued a 90-day finding that the species had been "eliminated" from approximately 55 percent of its historical range. 57 Fed. Reg. 54545 (Nov. 19, 1992).

22. On April 18, 1994, the Service published a 12-month finding that the proposed listing was warranted but precluded by higher priority listing actions. 59 Fed. Reg. 18353 (Apr. 18, 1994). Although the Service found the species faced "moderate yet imminent" threats to its habitat from urban development and conversion to agriculture, the Service also found that the California Tiger Salamander had a "wide-ranging distribution (i.e., infrequently scattered population localities over 250 miles in 24 California counties) and relatively large number of remaining breeding localities." *Id.* The Service observed that several populations in refuges, state parks, and other protected lands were not threatened with habitat loss and that large portions of the species' range were not significantly threatened. *Id.* Therefore, the Service concluded the species was not imminently threatened with extinction. *Id.* As a result, the California Tiger Salamander was deemed a "candidate" species in subsequent reviews. *See* 62 Fed. Reg. 49398 (Sept. 19, 1997); 64 Fed. Reg. 57534 (Oct. 25, 1999); and, 66 Fed. Reg. 54808 (Oct. 30, 2001).

23. On January 19, 2000, the Service issued an emergency rule listing the Santa Barbara County population of the California Tiger Salamander as an endangered distinct population segment or DPS. 65 Fed. Reg. 3096 (Jan. 19, 2000). On September 21, 2000, the Service permanently listed the Santa Barbara DPS as endangered. 65 Fed. Reg. 57242 (Sept. 21, 2000). On June 11, 2001, the Center for Biological Diversity (Center) submitted a petition to list

the Sonoma County population as an endangered DPS. When the Service did not list the DPS, the Center filed a complaint on February 27, 2002, in the federal district court for the Northern District of California to compel listing. *Center for Biological Diversity v. United States Fish and Wildlife Service*, case No. C-02-055-WHA (N.D. Cal.). On June 6, 2002, the district court approved a settlement agreement requiring the Service to (1) make findings on the Center's petition or to publish an emergency rule and proposed rule to list the Sonoma DPS, and (2) to publish a proposed rule to list the California Tiger Salamander throughout the remainder of its range. On July 22, 2002, the Service listed the Sonoma DPS as endangered on an emergency basis. 67 Fed. Reg. 47726 (July 22, 2002). On March 19, 2003, the Service permanently listed the Sonoma DPS as endangered. 68 Fed. Reg. 13498 (Mar. 19, 2003).

24. On May 23, 2003, the Service proposed listing the Central DPS as threatened. 68 Fed. Reg. 28648 (May 23, 2003). The Service also proposed downlisting the Santa Barbara and Sonoma DPS's from endangered to threatened and issuing a special rule under ESA Section 4(d) exempting certain routine grazing operations from the Section 9 "take" prohibition. In the proposed rule, the Service identified 486 Central DPS sites "known to be extant" and approximately 680,000 acres of occupied habitat. *Id.* at 28,653-54. The Service concluded that the "most overwhelming threat [to the Central DPS] is from continuing habitat destruction, degradation, and fragmentation." *Id.* at 28662.

25. On October 30, 2003, the California Tiger Salamander Coalition (including plaintiffs) provided information and documentation to the Service that showed there were over 640 Central DPS localities and as much as 4.1 million acres of potentially suitable habitat within the species' historic range, much of which had not been adequately surveyed to determine the presence of the salamander. The Coalition's comments also provided detailed information on the

effectiveness of existing laws, including examples of successful mitigation that was required through other regulatory programs. In addition, the Coalition submitted data that showed that 85 percent of the Central DPS localities and over 90 percent of the potentially suitable habitat were not under threat of urban development. The Coalition subsequently submitted data showing that approximately 50 additional Central DPS localities had been found over a five-month period following the submission of its original comments, bringing the total number of Central DPS localities close to 700. That submission also detailed that habitat loss due to agricultural conversion was not likely to pose a significant threat to the species in the foreseeable future.

26. On August 4, 2004, the Service issued a final rule listing the California Tiger Salamander (including the Central DPS) as threatened throughout its entire range. 69 Fed. reg. 47212 (Aug. 4, 2004). The final rule identified 711 Central DPS sites and an estimated 936,204 acres of "habitat associated with known California tiger salamander records." *Id.* at 47229. In its final rule, the Service stated that the Central DPS is "threatened by habitat destruction, degradation, and fragmentation due to urban development and conversion to intensive agriculture." *Id.* at 47212. The Service also found that existing "Federal, State, and local laws have been insufficient to . . . prevent further declines to the species." *Id.* at 47234. While it acknowledged that many of these laws require avoidance and minimization measures that benefit the species, the Service concluded that they are inadequate because they do not offer "complete" protection in that mitigation is ineffective because it still results in a net loss of habitat and fragmentation. *Id.* at 47234-37.

## INJUNCTIVE RELIEF ALLEGATIONS

27. Plaintiffs hereby reallege and incorporate by reference the allegations contained in Paragraphs 1 through 26 as though fully set forth herein.

28. If an injunction does not issue enjoining Defendants from enforcing the listing of the Central DPS, Plaintiffs will be irreparably harmed.

29. Plaintiffs have no plain, speedy, and adequate remedy at law.

30. If not enjoined by this Court, Defendants will continue to enforce or rely on the listing in derogation of Plaintiffs' rights and interests.

## DECLARATORY RELIEF ALLEGATIONS

31. Plaintiffs hereby reallege and incorporate by reference the allegations contained in Paragraphs 1 through 30 as though fully set forth herein.

32. An actual and substantial controversy exists between Plaintiffs and Defendants over Defendants' duty to comply with the ESA and APA in listing the Central DPS as a threatened species.

33. This case is presently justiciable because Defendants' failure to comply with these laws is the direct result of final agency action that has caused and will continue to cause immediate and concrete injury to Plaintiff associations and their members. Plaintiffs have a vital interest in knowing whether the final rule listing the Central DPS is statutorily valid.

34. Declaratory relief is, therefore, appropriate to resolve this controversy.

## CLAIMS FOR RELIEF

### First Claim for Relief

### Failure to Show the Listed Species is Threatened
### (Violation of the ESA and APA)

35. Plaintiffs incorporate herein by this reference all the allegations set forth in Paragraphs 1 through 34.

36. In assessing the status of the Central DPS in the final rule, the Service recites various risks to the species' survival and concludes these risks warrant listing the Central DPS as threatened. However, at no time does the final rule identify a standard against which the agency can determine threatened status. There is no way to determine from the rule, therefore, why these risks or level of risks justify listing the species as threatened as opposed to endangered or why listing is required at all. Under the APA, the agency must not only consider the relevant factors, it must also articulate "a rational connection between the facts found and the choice made." *Natural Resources Defense Council v. United States Department of the Interior*, 113 F.3d 1121, 1124 (9th Cir. 1997). But no such connection is apparent from the final rule. Neither the public nor a reviewing court can determine how and why the agency determined the Central DPS is threatened. The Service also overstated the risks to the species, particularly with respect to hybridization, and failed to consider the beneficial effects of habitat fragmentation in limiting the effects of hybridization.

37. By these acts or omissions, Federal Defendants violated the ESA, 16 U.S.C. § 1533(a)(1). Also, listing the Central DPS in the final rule was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law in violation of the APA, 5 U.S.C. § 706.

**Second Claim for Relief**

**Failure to Apply the Correct Standard in
Evaluating the Efficacy of Existing Regulations
(Violation of the ESA and APA)**

38. Plaintiffs incorporate herein by this reference all the allegations set forth in paragraphs 1 through 37.

39. One of the factors that must be considered in determining a species' status as threatened or endangered is the "inadequacy of existing regulatory mechanisms." 16 U.S.C. § 1533(a)(1). Although the agency considered this factor, it did so using the wrong standard.

40. In the final rule, the Service measured each existing regulatory program against the protections triggered by listing, and concluded that none of the programs would provide the same level of protection as the listing. For example, while it acknowledged that mitigation for project impacts on the Central DPS may be required under the Clean Water Act and the California Environmental Quality Act, the Service concluded that such mitigation does not provide "complete" protection because mitigation does not stop the ultimate loss of habitat. But this conclusion runs counter to the Service's own practice of requiring such mitigation to offset the adverse impacts of development on listed species. It also contradicts the Service's conclusion that such regulatory programs do provide meaningful protections for the species such that listing may not be required. In the Recovery Plan for the California Red-legged Frog (2002), which has overlapping habitat with the Central DPS, the Service noted that its plan could benefit other species, like the salamander, and prevent the need for future listing.

41. Under the ESA, the appropriate inquiry as to the efficacy of existing regulatory mechanisms is not whether those mechanisms provide "complete" protection, but whether they provide sufficient protection such that the species is neither threatened nor endangered. Because

no regulatory measure, including the listing of a species under the ESA, can provide "complete" protection, such a standard would necessitate listing any species.

42. By these acts or omissions, Federal Defendants violated the ESA, 16 U.S.C. § 1533(a)(1). Also, listing the Central DPS in the final rule was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law in violation of the APA, 5 U.S.C. § 706.

### Third Claim for Relief

### Failure to Use Best Available Scientific Data
### (Violation of the ESA and APA)

43. Plaintiffs incorporate herein by this reference all the allegations set forth in Paragraphs 1 through 42.

44. The Service is required to use the best scientific and commercial data available in making listing decisions. *See* 16 U.S.C. § 1533(b)(1)(A). However, the agency failed to do so. For example, in the final rule, the Service did not estimate the current population level of adult salamanders although it had the methodology to do so.

45. In its comments on the proposed rule, the Coalition estimated that the salamander population throughout the state was approximately 800,000, using published scientific methods. In the final rule, the Service rejected the Coalition's estimate but failed to provide a population estimate of its own, as it has for other species. 69 Fed. Reg. 47217, 47219. Such an estimate was required because the service acknowledges large areas (up to 2.5 million acres) of suitable habitat have not been surveyed. Therefore, the Service disregarded the best scientific data for determining population counts. A large population coupled with a widespread distribution, low threat, and a breeding pattern in which different cohorts breed in different years render the

chances of extinction nil, as the Service found in its original 12-month finding on the petition to list. *See* 59 Fed. Reg. 18353.

46. By these acts or omissions, Federal Defendants violated the ESA, 16 U.S.C. § 1533(a)(1). Also, listing the Central DPS in the final rule was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law in violation of the APA, 5 U.S.C. § 706.

### Fourth Claim for Relief

### Reliance on Historical Data Rather Than Current Data
### (Violation of the ESA and APA)

47. Plaintiffs incorporate herein by this reference all the allegations set forth in Paragraphs 1 through 46.

48. The ESA requires the Service to conduct a forward-looking inquiry into the status of a species to determine whether it is threatened or endangered. The Service acknowledged this requirement in the 1994 final rule listing four vernal pool fairy shrimp species:

> Unverifiable and/or contradictory information on the extent or former and current vernal pool habitat will generate continued debate on this issue throughout the foreseeable future. In a legal context, the extent of historic habitat loss is of academic interest only, since the five factors . . . under which species may qualify for listing look prospectively to the future rather than retrospectively on the past. The relevant issues are whether the current extent of fairy and tadpole shrimp habitat is depleted and/or fragmented enough to render the species vulnerable to extinction, or whether foreseeable threats similarly threaten the species.

59 Fed. Reg. 48136, 48144 (Sept. 19, 1994)

49. In the final rule, the Service acknowledged it did not have good documentation on the historical distribution of the salamander. 69 Fed. Reg. 47232. However, the alleged loss of 75 percent of historical habitat was a major impetus for listing the Central DPS. The view that there has been a large loss of historical habitat permeates the Service's analysis in the final rule.

50. By these acts or omissions, Federal Defendants violated the ESA, 16 U.S.C. § 1533(a)(1). Also, listing the Central CTS in the final rule was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law in violation of the APA, 5 U.S.C. § 706.

## PRAYER FOR RELIEF

**Wherefore, Plaintiffs pray**

**As to the First Claim for Relief:**

That this Court declare the final rule listing the Central DPS invalid under the ESA and APA because Defendants failed to identify a standard for determining the threatened status of the species.

**As to the Second Claim for Relief:**

That this Court declare the final rule listing the Central DPS invalid under the ESA and APA because Defendants failed to apply the correct standard in evaluating the efficacy of existing regulations.

**As to the Third Claim for Relief:**

That this Court declare the final rule listing the Central DPS invalid under the ESA and APA because Defendants failed to use the best scientific data available.

**As to the Fourth Claim for Relief:**

That this Court declare the final rule listing the Central DPS invalid under the ESA and APA because Defendants relied on historical data rather than current data.

**As to all claims for relief:**

That this Court issue a judgment and order vacating the final rule and enjoining Defendants from enforcing or otherwise acting pursuant to the final rule; award attorneys' fees, expenses, and costs; and, award such other relief as the Court deems just and proper.

DATED: May 15, 2006.

Respectfully submitted,

*/s/ William P. Horn*
WILLIAM P. HORN
District of Columbia Bar No. 375666
1155 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 659-5800
Facsimile: (202) 659-1027

Attorney for Plaintiffs

M. REED HOPPER (Pro Hac Vice Applicant)
ROBIN L. RIVETT (Pro Hac Vice Applicant)
Pacific Legal Foundation
3900 Lennane Drive, Suite 200
Sacramento, CA 95834
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

Attorneys for Plaintiffs

PAUL CAMPOS (Of Counsel)
Home Builders Association of
Northern California
200 Porter Drive, Suite 200
San Ramon, CA 94583
Attorney for Plaintiff Home Builders Association of
Northern California

G:\101494\1\CP0356.DOC