Exhibit 1 to Complaint for Declaratory Judgment and Injunctive Relief



17th Floor | Four Embarcadero Center | San Francisco, CA 94111-4106
415-434-9100 *office* | 415-434-3947 *fax* | *www.sheppardmullin.com*

Robert J. Uram
Writer's Direct Line: 415-774-3285
ruram@sheppardmullin.com

August 30, 2004

Our File Number: 0SPL-105166

*VIA FACSIMILE AND FEDEX*

Gale Norton
Secretary of the Interior
1849 C Street, N.W.
Washington, DC  20240
Facsimile: 202-208-6956

Re:  60-Day Notice of Intent to Sue for Violations of Section 4 of the Endangered Species Act - Listing of the Central California population of the California Tiger Salamander, 69 Fed. Reg. 47,212 (Aug. 4, 2004)

Dear Secretary Norton:

This notice is provided pursuant to Sections 11(g)(1)(C) and 11(g)(2)(C) of the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. § 1540(g)(1)(C), (2)(C).  We write on behalf of the Central California Tiger Salamander Coalition[1] ("Coalition") to notify you of violations of the ESA related to the Secretary of the Interior and Fish and Wildlife Service's (collectively, "FWS") promulgation of the Final Rule, "Determination of Threatened Status for the California Tiger Salamander," 69 Fed. Reg. 47,212 (Aug. 4, 2004) ("Final Rule").  The Final Rule's determination that the California tiger salamander ("CTS"), and particularly its central California population ("Central CTS"), is threatened with extinction is unlawful for the reasons set forth below.  The Coalition asks the FWS to take immediate action to withdraw the portion of the Final Rule listing the Central CTS as a threatened species.  If the FWS fails to take such action, the Coalition intends to file a lawsuit to compel the FWS to do so.

---

[1]  The members of the Coalition include the California Alliance for Jobs, California Association of Winegrape Growers, California Building Industry Association, California Business Properties Association, California Cattlemen's Association, California Chamber of Commerce, California Farm Bureau Federation, California Mining Association, California Natural Resources Group, California State Association of Counties, Construction Materials Association of California, Consulting Engineers and Land Surveyors of California, Family Winemakers of California, and Home Builders Association of Northern California.

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Gale Norton
August 30, 2004
Page 2

I.  **Legal Background**

The ESA authorizes the FWS to list endangered or threatened species. 16 U.S.C. § 1533(a)(1), (c). The term "endangered species" is defined as any species which is in danger of extinction throughout all or a significant portion of its range . . . ." *Id.* § 1532(16). A "threatened species" is defined as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). The ESA prohibits the unauthorized take of an endangered species.[2] *Id.* § 1538(a)(1)(B). Take is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). The FWS has, by regulation, extended the ESA's take prohibition to threatened species. 50 C.F.R. § 17.31(a); *see also* 16 U.S.C. § 1533(d).

To determine whether a species is endangered or threatened, the FWS must evaluate the status of the species in light of five factors. 16 U.S.C. § 1533(a)(1). These factors include the present or threatened destruction, modification, or curtailment of its habitat or range; overutilization for commercial, recreational, scientific, or educational purposes; diseases or predation; the inadequacies of existing regulatory mechanisms; or other natural and manmade factors affecting its continued existence. *Id.* The listing determination must be made "solely on the basis of the best scientific and commercial data available . . . after conducting a review of the status of the species and after taking into account those efforts . . . by any State . . . to protect such species . . . ." *Id.* § 1533(b)(1)(A).

II. **Factual Background**

On February 26, 1992, the FWS received a petition from Bradley Shaffer to list the CTS. Later that year, the FWS issued its 90-day finding, which noted that the species had been "eliminated" from approximately 55 percent of the estimated 300-350 historical breeding localities. 57 Fed. Reg. 54,545 (Nov. 19, 1992). On April 18, 1994, the FWS published its 12-month finding that the proposed listing was warranted but precluded by higher priority listing actions. 59 Fed. Reg. 18,353 (Apr. 18, 1994). The 12-month finding concluded that the species faced "moderate yet imminent" threats, including "urban development, [and] conversion of natural habitat to agriculture." *Id.* However, the FWS gave the species a low listing priority because of its "wide-ranging distribution (i.e., infrequently scattered population localities over

---

[2] The FWS may authorize take that is incidental to otherwise lawful activities where, for federal activities, the proposed action is not likely to jeopardize the continued existence of a listed species, 16 U.S.C. § 1536(a)(2), (b)(4), or where, for activities carried out by private individuals, the applicant demonstrates that the impacts have been avoided, minimized, and mitigated to the extent practicable and that the take will not appreciably reduce the likelihood of survival and recovery of the species in the wild, *id.* § 1539(a)(1)(B), (2)(B).

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Gale Norton
August 30, 2004
Page 3

250 miles in 24 California counties) and relatively large number of remaining breeding localities." *Id.* It observed that several populations in refuges, state parks, and other protected lands were not threatened with habitat loss and, further, that large portions of the species' range were not significantly threatened. *Id.* It also concluded that because of these factors the species would not become imminently threatened with extinction. *Id.* The CTS was maintained as a candidate species in subsequent reviews. 62 Fed. Reg. 49,398 (Sept. 19, 1997); 64 Fed. Reg. 57,534 (Oct. 25, 1999), and 66 Fed. Reg. 54,808 (Oct. 30, 2001).

On January 19, 2000, the FWS issued an emergency rule listing the Santa Barbara County population of the CTS as an endangered distinct population segment ("DPS"). 65 Fed. Reg. 3,096. The FWS permanently listed the Santa Barbara DPS as endangered later that year. 65 Fed. Reg. 57,242 (Sept. 21, 2000). On June 11, 2001, the Center for Biological Diversity ("CBD") submitted a petition to list the Sonoma County CTS population as an endangered DPS. CBD filed a complaint in the district court for the Northern District of California for the FWS's alleged failure to list the Sonoma County DPS on February 27, 2002. *Center for Biological Diversity v. United States Fish and Wildlife Service*, Case No. C-02-055-WHA (N.D. Cal.). On June 6, 2002, the Court approved a settlement agreement requiring the FWS to (1) make findings on the CBD's petition or to publish an emergency rule and proposed rule to list the Sonoma DPS, and (2) publish a proposed rule to list the CTS throughout the remainder of its range. The FWS subsequently listed the Sonoma DPS as endangered on an emergency basis, 67 Fed. Reg. 47,726 (July 22, 2003), and then extended the listing permanently, 68 Fed. Reg. 13,498 (Mar. 19, 2003).

On May 23, 2003, the FWS proposed to list the Central CTS as threatened. 68 Fed. Reg. 28,648 ("Proposed Rule"). The FWS also proposed downlisting the Santa Barbara and Sonoma DPSs from endangered to threatened and issuing a special rule under ESA Section 4(d) exempting certain routine grazing operations from the take prohibition. In the Proposed Rule, the FWS identified 486 Central CTS sites "known to be extant" and approximately 680,000 acres of occupied habitat. *Id.* at 28,653-54. The FWS concluded that "[t]he most overwhelming threat [to the Central CTS] is from continuing habitat destruction, degradation, and fragmentation." *Id.* at 28,662. According to the Final Rule, "[d]estruction, modification, and curtailment of Central [CTS] habitat is caused by a variety of urban and agricultural uses." *Id.* at 28,653.

The Coalition and many other interested parties submitted extensive comments on the status of the species. On October 30, 2003, the Coalition provided information and documentation to the FWS that showed there were over 640 Central CTS localities and as much as 4.1 million acres of potentially suitable habitat within the species' historic range, much of which had not been adequately surveyed to determine presence. The Coalition's comments also provided detailed information on the effectiveness of existing laws, including examples of successful mitigation that was required through other regulatory programs. Most importantly, the Coalition submitted data that showed that 85 percent of Central CTS localities and over 90 percent of the potentially suitable habitat were not under threat of urban development. The Coalition subsequently submitted data showing that approximately 50 additional Central CTS

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Gale Norton
August 30, 2004
Page 4

localities had been found over a five-month period following the submission of its original comments, bringing the total number of Central CTS localities to close to 700. It also provided detailed information that indicated that habitat loss due to agricultural conversions was not likely to pose a significant threat to the species in the foreseeable future.

On August 4, 2004, the FWS issued the Final Rule listing the CTS as threatened throughout its range. 69 Fed. Reg. 47,212. The Final Rule identified 711 Central CTS occurrences and an estimated 936,204 acres of "habitat associated with known [CTS] records." *Id.* at 47,229. The FWS stated in the Final Rule that the Central CTS is "threatened by habitat destruction, degradation, and fragmentation due to urban development and conversion to intensive agriculture." *Id.* at 47,212. It also found that existing federal, state, and local laws are unlikely to prevent further declines to the species." *Id.* at 47,234. While acknowledging that many of these laws require avoidance and minimization measures that benefit the species, the FWS concludes that they are inadequate because they do not offer the same level of protection that listing would provide and that mitigation is ineffective because it still results in a net loss of habitat and fragmentation. *Id.* at 47,234-37.

### III.   Violations of the Endangered Species Act and the Administrative Procedure Act

#### A.   The FWS Failed to Meet its Burden of Showing that a Widely Distributed Species Facing Only a Minimal Risks is Threatened.

Under the Administrative Procedure Act ("APA"), "the proponent of a rule or order has the burden of proof." 5 U.S.C. § 556(d). When the FWS proposes to list a species, it has the burden of proving by convincing, affirmative evidence that the proposed action is warranted. *See, e.g., Building Industry Ass'n of Southern California v. Norton*, 247 F.3d 1241, 1246-47 ("D.C. Cir. 2001) (finding that the FWS "may not base its listing on speculation or surmise"). The FWS has not met that burden with the Final Rule.

The FWS's Proposed Rule identified only 486 extant sites and less than 700,000 acres of "potential" habitat. 68 Fed. Reg. 28,653-54. It described the effect of planned development and planned agricultural conversions as an "overwhelming" threat to the CTS. *Id.* at 28,662. It also indicated the range of the CTS had been reduced. *Id.* at 28,653-54. The Final Rule, by contrast, acknowledges the Central CTS continues to occupy much of it original range. 69 Fed. Reg. 47,221. It shows that the CTS has 709 locations in the Central CTS area alone and nearly 800 known locations range wide. *Id.* at 47,229. This represents a 32 percent increase over the Proposed Rule and a fourfold increase over the initial warranted but precluded finding. Similarly, the Service's estimate of occupied habitat increased to 936,000 acres in the Central CTS area alone, a 34 percent increase. The FWS also observed that more Central CTS are extant than have been identified because significant areas of suitable habitat have not been surveyed.

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Gale Norton
August 30, 2004
Page 5

The FWS also retreated from its view that planned development and agriculture conversion was an overwhelming threat to the CTS.[3] The Final Rule acknowledges that planned development will affect less than 8 percent of its occupied habitat in the Central CTS area and that the amount of agricultural land being fallowed actually exceed the amount of grazing land converted to agriculture. *Id.* at 47,230. In fact, the amount of occupied habitat that the Service identifies as not being under any threat is over 736,000 acres. *Id.* at 47,230-31. This exceeds the amount of potential habitat identified in the Proposed Rule. In addition, 173,000 acres are "threatened" only by impacts from existing low density and very low density development. *Id.* at 47,230. It is not clear how existing development constitutes a future threat to the species. Finally, the Final Rule also acknowledges that 200,000 acres of occupied habitat in the Central CTS area are permanently protected, compared to 60,000 acres of protected lands identified in the Proposed Rule. *Compare. id.* at 47,231 *with* FWS, Memorandum to Record, re: Explain Methods and Results of GIS Model to Evaluate Threats, Habitat, and Protected Lands for the Proposed Rule to List the California Tiger Salamander, *Ambystoma Californiense*, at Threatened, Excluding Santa Barbara and Sonoma Subpopulations (Mar. 7, 2003).

Even though virtually every objective indicator in the Final Rule shows that the status of the species as actually significantly better than had been described in the Proposed Rule and hugely better than in its initial warranted but precluded finding, the FWS still concludes that the Central CTS is threatened. It is not clear how or why the FWS reached that conclusion. Nowhere in the Final Rule does the FWS state in clear, understandable, and objective terms what standard it applied to determine the Central CTS was threatened. The FWS's determination is even more puzzling given its other recent listing decisions, in which the FWS concluded that a species that is less abundant, more narrowly distributed, and with a smaller percentage of its habitat protected was not threatened. *See, e.g.*, 69 Fed. Reg. 3592, 3595 (Jan. 26, 2004). The FWS's analysis of the threat posed by hybridization is arbitrary and capricious. The Final Rule does no more than state its conclusion and does not support it with any explanation of what standard is was using to determine the species was threatened. In so doing, the FWS violates the ESA and the APA.

  B. **The FWS Disregarded the Best Scientific and Commercial Information Available In Listing the Central CTS Because It Did Not Estimate Population or Take into Account CTS in Suitable Habitat That Has Not Been Surveyed.**

The FWS is required to rely solely on the best scientific and commercial information available in making its listing decisions. 16 U.S.C. § 1533(b)(1)(A). Although the FWS has corrected many of the factual errors and omissions, such as the number of known

---

[3]  The FWS's introduction of, and reliance on, a new factor—the alleged threat to the CTS from existing low density and very low density housing—also violates the APA.

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Gale Norton
August 30, 2004
Page 6

localities, that were present in the Proposed Rule, it continues to disregard important information in its evaluation of the status of the Central CTS in the Final Rule.

The FWS declined to estimate the current population level of adult CTS. The Coalition determined the adult CTS population included approximately 800,000 individuals based on published scientific methods. In the Final Rule, the FWS rejects the Coalition's estimate on a number of grounds—none of which is sustainable—but declines to make a population estimate of its own. 69 Fed. Reg. 47,217, 47,219. In doing so, the Final Rule disregards the ESA's mandate that it use the best available information to estimate such a key element. In fact, any credible methodology will result in a very high number of adult CTS, certainly several hundred thousand. A large population coupled with a widespread distribution, low threat, and a breeding pattern in which different cohorts breed in different years render the chances for extinction of this species as essentially nonexistent in the foreseeable future, as the FWS has previously found in the 12-month finding on the original petition. *Cf.* 59 Fed. Reg. 18,353 (Apr. 18, 1994).

It is not legally permissible under the best available information standard to evaluate the status of the CTS without making at least some estimate of population. The Service and the Coalition are now largely in agreement on the number of known CTS localities. If each locality has only a small number of CTS—for example, less than ten—one could draw the conclusion that a species which was limited to 8,000 adults (800 locations times ten adults) could be threatened with extinction by even a relatively low level of threat. On the other hand if each locality has a large number of individuals—for example, a thousand or more—one could draw the conclusion that a species that had 800,000 adult individuals (800 locations times one thousand adults) would not be easily threatened with extinction.

Additionally, the FWS acknowledges that large areas of suitable CTS habitat have not been surveyed. 69 Fed. Reg. 47,329. Nevertheless, the FWS does not account for the many extant CTS localities that have not been identified in its analysis in the Final Rule. Instead, it bases its assessment solely on the number of known localities, and as a result, the Final Rule's estimate of acres of occupied habitat is clearly a minimum. *Id.* There are, in fact, an additional 2.5 million acres of suitable habitat within the Central CTS range that may be found to be occupied if additional survey work is done. The FWS did not factor this information into its evaluation of the CTS or even identify the extent of the species' range because it assertedly did not have sufficient information on whether these lands had suitable aquatic breeding habitat. Yet the FWS has data on aquatic features throughout much of this area from information collected on other species, such as the California red-legged frog and vernal pool fairy shrimp, which share similar breeding habitat with the CTS. This information was ignored by the FWS.

By ignoring these and other data that tend to show that the species is not threatened with becoming endangered in the foreseeable future, the FWS has violated the ESA's requirement to use the best available scientific and commercial date. By deviating from past practices without

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Gale Norton
August 30, 2004
Page 7

providing a plausible rationale for doing so, the FWS has acted arbitrarily and capriciously, in violation of the ESA and the APA.

      C.    **The FWS Applied the Wrong Legal Standard in Evaluating the Efficacy of Existing Regulations Because It Disregarded Any Protections that Were Not As Effective As Protections Under the ESA.**

The Final Rule's treatment of the efficacy of existing regulations also violates the ESA and the APA. While the Service acknowledges that many federal, state, and local measures provide some protections to the species, the FWS ultimately concludes that they have been, and will continue to be, ineffective in stopping the decline of the species, even though it had recognized their efficacy in other listing decisions. *Id.* at 47,234-37. It reaches this conclusion by applying the wrong legal standard.

In its analysis, the FWS measures each regulatory program against the protections triggered by listing, and concludes that none provides the same level of "complete" protection. For example, in commenting on the U.S. Army Corps of Engineers' regulation of impacts to aquatic resources, the FWS states, "While the Clean Water Act provides a means for the Corps to regulate the discharge of dredged or fill material into waters and wetlands of the United States, it does not provide complete protection . . . [and] . . . is inadequate to completely protect the CTS from further decline." *Id.* at 47,234; *see also id.* at 47,235 ("Although some regulatory protections may be afforded to the Central [CTS] from the California red-legged frog, those protections do not fully protect the salamander . . . .").

The FWS goes even further in its analysis of the effectiveness of the California Environmental Quality Act ("CEQA"): "The avoidance, minimization, and mitigation measures of individual projects nevertheless tend to result in fragmented landscapes and a trend of cumulative regional habitat loss and fragmentation. Mitigation does not create new land, it simply balances land converted with land protected for natural values, so even with mitigation, a net loss of habitat results. So while mitigation provided by developments under CEQA may be offered with the intent to benefit CTS, the resulting fragmentation of regional landscapes over time creates high risk of disrupting or precluding migration patterns. *Id.* at 47,236. This conclusion not only sets an impractical standard for "complete" protection, but is contrary to the FWS's own routine practice of requiring such mitigation to offset the adverse impacts of development to other species that would be similarly affected by habitat loss and fragmentation. It also addresses the wrong question. Under the ESA, the appropriate inquiry is not whether mitigation replaces habitat lost to development. Rather, it is whether the mitigation provided, in addition to other remaining habitat, allows for the continued existence of the species. In fact, mitigation is an effective way of addressing CTS impacts and there is demonstrated effectiveness of creation of CTS mitigation breeding ponds.

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Gale Norton
August 30, 2004
Page 8

In similarly sweeping remarks, the FWS methodically dismisses powerful legal protections of other existing regulations. While it is true that no single law affords as much protection to the Central CTS as listing would, much less complete protection, that is not the proper standard. The issue is whether existing laws and regulations, acting together, provide sufficient protection that listing is not needed. The Final Rule does not address this issue. By requiring complete protection from each regulatory program and failing to consider how the regulations work together, the FWS has set a standard that is unattainable and inconsistent with its own practices.[4] For these reasons, it violates the ESA and the APA.

D.  **The FWS Improperly Relied on Loss of Historical Habitat Even Though It Acknowledged that Data on That Factor Was Speculative.**

The ESA requires the FWS to conduct a forward-looking inquiry into the status of a species to determine whether or not it is, or is likely to become, endangered or threatened in the foreseeable future. The FWS has acknowledged this principle in prior listing determinations. In the 1994 Final Rule listing four vernal pool shrimp species, the FWS observed:

> Unverifiable and/or contradictory information on the extent of former and current vernal pool habitat will generate continued debate on this issue throughout the foreseeable future. In a legal context, the extent of historic habitat loss is of academic interest only, since the five factors . . . under which a species may qualify for listing looks prospectively to the future rather than retrospectively on the past. The relevant issues are whether the current extent of fairy and tadpole shrimp habitat depleted and/or fragmented enough to render the species vulnerable to extinction, or whether foreseeable threats similarly threaten the species.

59 Fed. Reg. 48136, 48144 (Sept. 19, 1994).

In the Final Rule, the Service acknowledges that it does not have good documentation on the historical distribution of the species. 69 Fed. Reg. 47,232. One statement in the Final Rule claims that the listing decision is based on estimated current distribution and habitat and assumes available habitat is occupied. 69 Fed. Reg. 47,214. In fact, the Final Rule is based in large part on a speculative claim that 75 percent of the historical habitat has been lost. *Id.* at 47,240. The Final Rule states, "We agree that the CTS still occurs throughout much of its historic range, although we estimate approximately 75 percent of the species' historic natural

---

[4]  For example, the FWS reached very different conclusions regarding the efficacy of the same regulatory measures in the Recovery Plan for the California Red-legged Frog (2002). In fact, the FWS even notes that the ecosystem approach used in its recovery planning many benefit other species and prevent the need for future listings. *Id.* at 38.

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Gale Norton
August 30, 2004
Page 9

habitat has been lost within this range." *Id.* The view that there has been a large loss of historical CTS habitat permeates the FWS's analysis in the Final Rule. The reliance on historical loss is not only legally inappropriate but also factually questionable. The California Fish and Game Commission has criticized the use of the study (prepared by Shaffer) upon which the FWS relies to assess the status of the species. By relying on speculative loss of historical habitat to evaluate the status of the species, the FWS has acted inconsistently with its past practices and, more importantly, in violation of the ESA and APA.

IV.     **Conclusion**

The FWS violates the ESA and APA in the Final Rule by failing to use the best available science in reaching its listing decision, by utilizing the wrong legal standard in evaluating the efficacy of existing regulations, by failing to provide adequate explanations for its conclusions, and by improperly relying on presumed historical losses. The FWS should address these violations by immediately suspending and withdrawing the portion of the Final Rule listing the Central CTS as threatened. If the FWS fails to take such action, the Coalition intends to file suit to compel the Service to do so.

If you have questions about this notice, please contact me at the phone number or address listed above.

Very truly yours,

/s ROBERT J. URAM

Robert J. Uram

for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

W02-SF:FRU\61426067.2

cc:    Steve Williams, USFWS (via mail)
       Steve Thompson, USFWS (via mail)
       Wayne White, USFWS (via mail)
       Ryan Broddrick, CDFG (via mail)
       Coalition Members (via e-mail)