Exhibit A, Attachment 4
Civ. No. 06-00932 (RWR)

1  Michael D. Newman (State Bar No. 152789)
   Steven P. Rice (State Bar No. 094321)
2  CROWELL & MORING LLP
   3 Park Plaza
3  20th Floor
   Irvine, CA 92614-8505
4  Phone: 949-263-8400
   Facsimile: 949-263-8414
5  srice@crowell.com
6
7  Steven P. Quarles
   J. Michael Klise
8  Thomas R. Lundquist
   CROWELL & MORING LLP
9  1001 Pennsylvania Ave., NW
   Washington, D.C. 20004-2595
10 Phone: 202-624-2667
   Facsimile: 202-628-5116
11 tlundquist@crowell.com
12
   Attorneys for Plaintiffs
13

ORIGINAL
FILED

FEB 19 2004

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
            DEPUTY CLERK

14              IN THE UNITED STATES DISTRICT COURT
15             FOR THE EASTERN DISTRICT OF CALIFORNIA

16 | Home Builders Association of Northern        )   CIV.S- 0 4 - 0 3 4 5 LKK GGH
   | California; Blochman Union School District;)
17 | Burbank Housing Development                  )   No. _____
   | Corporation; City of Rohnert Park, CA; City )
18 | of Santa Rosa, CA; Santa Maria Public        )   **COMPLAINT FOR**
   | Airport District; Airport Business Center;   )   **DECLARATORY AND**
19 | Bellevue Ranch Phase 7, LP; BH-PHI           )   **INJUNCTIVE RELIEF**
20 | Partners a California General Partnership    )
   | d/b/a Rivendale Homes; Bradley Land          )
21 | Company; Clement C. Carinelli; Coalition     )
   | of Labor, Agriculture and Business of Santa  )
22 | Barbara County; Cobblestone Homes, Inc.;     )
23 | A.F. and C.A. Fugler, Inc.; Grower-Shipper   )
   | Vegetable Association of Santa Barbara and   )
24 | San Luis Obispo Counties; Dennis R.          )
   | Hunter; Jackson Family Investments II,       )
25 | LLC; Mahoney Leasing; Mead Clark             )
   | Lumber Company; North Coast Builders         )
26 | Exchange; Northern California Engineering    )
27 | Contractors Association; James Ratto;        )
   | Redwood Equities Investments, LLC; Ryder     )
28 | Homes of California; Darwin E. and Janette   )
   | T. Sainz; Santa Maria Valley Chamber of      )

crowell moring
3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

1

1 Commerce; Santa Maria Valley Economic  )
 Development Association; Santa Rosa   )
2 Associates II; Santa Rosa Chamber of  )
 Commerce; Schellinger Bros.; SW Santa  )
3 Rosa Partners, LP; SWSR Associates, LLC, )
               )
4      Plaintiffs,     )
               )
5               )
   v.            )
6               )
 STEVEN A. WILLIAMS, Director of the  )
7 United States Fish and Wildlife Service;  )
 GALE A. NORTON, Secretary of the   )
8 United States Department of the Interior;  )
 and STEVE THOMPSON, Regional   )
9 Director of the California/Nevada    )
 Operations Office, United States Fish and  )
10 Wildlife Service, Sacramento, CA,   )
               )
11               )
      Defendants.     )
12               )
               )
13

## JURISDICTION AND VENUE

1. This is a suit for judicial review of federal agency actions for compliance with the Endangered Species Act ("ESA") and Administrative Procedure Act ("APA").  This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331, and related provisions in 5 U.S.C. §§ 559, 701-06; 16 U.S.C. § 1540(g); and 28 U.S.C. §§ 2201-02.  The challenged final agency actions are the determinations by rule of the U.S. Fish and Wildlife Service ("FWS") that: (1) the California tiger salamanders ("CTSs") located in Santa Barbara County are a valid "distinct population segment" ("DPS") and an "endangered species" at 65 Fed. Reg. 57242 (Sept. 21, 2000); and (2) the CTSs located in Sonoma County are a valid DPS and an "endangered species" at 68 Fed. Reg. 13498 (March 19, 2003).  An actual controversy exists between the parties hereto within the jurisdiction of this Court.

2. Venue in this district is proper under 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391.  FWS's Sacramento office is within this judicial district.  That office developed,

/ / /

crowell moring
3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

1   supervised, submitted for review to FWS headquarters and the United Stated Department of the

2   Interior ("Department"), and otherwise participated in the challenged actions.

3                                          **OVERVIEW**

4        3.    The ESA allows FWS to designate (or "list") a "species" as an "endangered

5   species" or "threatened species." Following such a designation (or "listing"), the constraints of

6   ESA § 7(a)(2) apply to all federally-assisted actions, and the ESA § 9 "take" and other

7   prohibitions apply to all public and private persons. Under the ESA's definition of a "species,"

8   the smallest "species" unit eligible for further consideration for potential ESA listing is a

9   "distinct population segment" of a vertebrate species or DPS. 16 U.S.C. § 1532(16). Consistent

10  with the ESA legislative intent to apply the DPS concept "sparingly," the FWS adopted a binding

11  Distinct Population Segment Policy at 61 Fed. Reg. 4722 (Feb. 7, 1996) ("DPS Policy"). The

12  DPS Policy requires that, to qualify as a DPS, the population must satisfy standards concerning

13  both "discreteness" and "significance" to the entire species. *See National Ass'n of Home*

14  *Builders v. Norton*, 340 F.3d 835 (9th Cir. 2003) (finding that an alleged DPS of the cactus

15  ferruginous pygmy-owl did not fulfill the "significance" standard of the DPS Policy and was

16  unlawfully listed under the ESA).

17       4.    The CTS biological species, *Ambystoma californiense*, exists in 25 counties in

18  California on over 11 million acres of suitable habitat. *See* 68 Fed. Reg. 28648, 28449-56

19  (May 23, 2003) (preamble to the latest proposed ESA rule to list another, third DPS of CTSs).

20  Plaintiffs' principal claim is that FWS unlawfully found that the CTSs located in Sonoma County

21  and Santa Barbara County (the northern and southern fringes of the CTS's range, respectively)

22  are valid DPSs and constitute "endangered species."

23                                          **PARTIES**

24       5.    The Plaintiffs are public and private entities who are suffering economic and other

25  injuries that are fairly traceable to the challenged rulemakings concerning the DPS and

26  "endangered species" designations for the subsets of CTSs in Santa Barbara County and in

27  Sonoma County. These injuries confer standing. These injuries occur primarily in three ways:

28  ///

crowell moring
3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

3

a. First, after ESA listing, ESA § 7(a)(2) only allows a federally-assisted action (*e.g.*, projects of local government and private parties that require a Clean Water Act § 404 permit from the U.S. Army Corps of Engineers) to go forward if it is found "not likely to jeopardize the continued existence" of a listed DPS of CTS, after "consultation" with FWS. 16 U.S.C. § 1536(a)(2). Delays in the ESA consultation process, information costs (*e.g.*, CTS surveys and biological reports), and "take" minimization measures that FWS requests all impose time and monetary burdens on the projects' proponents. These burdens sometimes adversely affect important public interests, such as the public interest in affordable housing and completion of public projects in a timely and cost-effective manner.

b. Second, ESA § 9 and FWS regulations prohibit land uses that would "take" or "harm" listed CTSs. 16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. § 17.3. This imposes on the proponents of projects the additional costs in surveying for CTSs that often do not exist on the subject properties, in adopting take-avoidance or take-authorization measures (including authorizing incidental take under 16 U.S.C. §§ 1536(b)(4) or 1539(a)(2)), and other attendant costs and time delays.

c. Third, State and local authorities are applying additional requirements on projects due to the ESA-listed species. For example, these authorities are interpreting the California Environmental Quality Act ("CEQA") to require additional analysis of the projects' impacts on CTS and discussion/adoption of mitigation measures. Some localities have increased their development fees to reflect some of the increased costs. Additionally, some local jurisdictions are declining to issue local permits until the project proponent satisfies FWS that there would be no "take" or that the "take" has been authorized through the costly processes in ESA §§ 7(b)(4) or 10(a)(2), 16 U.S.C. §§ 1536(b)(4) and 1539(a)(2).

6. This case is being brought by a diverse group of public and private Plaintiffs. This illustrates the widespread dissatisfaction with FWS's DPS and listing determinations. The Plaintiffs are organized into certain groups in the paragraphs below.

7. The Plaintiffs include several public and public interest entities:

/ / /

4

1    a.    The Blochman Union School District. This School District is in a rural

2  portion of the City of Santa Maria, CA. The School District is being injured by the DPS and

3  endangered species designations of CTSs in Santa Barbara County, which has halted or delayed

4  much new home construction. As a result, this rural school district is suffering from lower

5  enrollment and adverse effects on the school's tax base.

6    b.    The Burbank Housing Development Corporation is a non-profit

7  organization dedicated to increasing the supply of housing in Sonoma County for low-income

8  people of all ages and backgrounds. Burbank Housing has had a total of seven project sites

9  adversely affected by the challenged actions with respect to CTSs in Sonoma County. Four of

10  these projects ultimately received FWS's approval under the ESA, after significant consultant

11  costs were incurred. One proposed project was lost because of uncertainty concerning CTS

12  mitigation measures, causing a $70,000 loss to Burbank Housing. Another site could be lost for

13  the same reasons, which would result in over a $100,000 loss of predevelopment resources. The

14  remaining fourth project has been indefinitely postponed.

15    c.    The City of Rohnert Park, CA. Rohnert Park is located in Sonoma

16  County, within the potential range of the CTS. The ESA listing of CTSs in Sonoma County

17  imperils implementation of the Rohnert Park General Plan, which includes three Specific Plan

18  Areas within the City's urban growth boundary that are needed to provide affordable housing.

19  Additionally, citizens of Rohnert Park are among the 200,000 Sonoma County residents who rely

20  on the Santa Rosa Subregional Reclamation System. The operation of this System is threatened

21  by the challenged actions, and the replacement cost for an irrigation system is estimated to

22  exceed $200 million.

23    d.    The City of Santa Rosa, CA. The challenged DPS and endangered species

24  designations for CTSs in Sonoma County is adversely affecting the City of Santa Rosa in several

25  ways. First, the challenged actions imperil implementation of the Santa Rosa General Plan,

26  which calls for increased affordable housing. Second, the decline in housing construction could

27  reduce the City's utilities connection fees by an estimated $2 million and reduce annual rate

28  revenue by an estimated $200,000. Third, the City operates the Santa Rosa Subregional

crowell | moring
3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

1   Reclamation System that irrigates approximately 6,500 acres within the potential range of the

2   CTS as part of a reclaimed water program. If the System were to be prohibited from irrigating

3   property within the CTS's range, the System would have to find alternative disposal options for

4   the reclaimed water and could incur additional expenses of up to $200 million if required to

5   replace all of its current irrigation lands. The City must also construct recycled water storage

6   ponds to expand its urban reuse program. Locating storage outside of the CTS's range could

7   increase the cost of storage by $5 to $20 million.

8          e.      The Santa Maria Public Airport District. The challenged ESA actions

9   with respect to CTSs in Santa Barbara County have delayed and increased the costs for the

10  District's Airport Research Park and golf course project. Negotiations with FWS cost the

11  District over $125,000 in legal and consultant fees and resulted in the loss of a low-interest loan

12  due to the inability to begin construction. Further costs and delays may be incurred in the future.

13         8.      The Plaintiffs include many entities associated with construction and

14  homebuilding. These Plaintiffs are:

15         a.      The Home Builders Association of Northern California. HBANC

16  represents over 950 members active in the homebuilding and construction industry in the San

17  Francisco Bay area. HBANC was a signatory to the April 16, 2003 notice of ESA citizen suit

18  concerning CTSs in Sonoma County. HBANC's members own property and conduct business in

19  Sonoma County. HBANC's members continue to suffer economic hardships traceable to the

20  listing of the Sonoma County population of the CTS as a purported DPS. HBANC's members

21  have experienced, and continue to experience, injury as a direct result of the listing, including:

22  delay or outright stoppage of project processing; increased costs; and inability to obtain

23  necessary development permits. For example, building permits for single-family detached

24  housing in Santa Rosa have dropped from 909 in 2001 to 330 in 2003, after the ESA listings of

25  the subset of CTSs in Sonoma County. The fact that only 11 subdivisions are currently offering

26  houses for sale in Sonoma County, when housing sales activity in the rest of the Bay Area is at a

27  relatively high level, also shows that the CTS listing is adversely affecting HBANC's members,

28  as well as impairing the availability of affordable housing. Additionally, one of HBANC's

crowell moring

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

1    missions is to ensure that environmental rules impacting the homebuilding industry are

2    promulgated in accordance with governing procedural and substantive requirements. Thus, the

3    injuries asserted herein are germane to the organization's purposes. Finally, HBANC has been

4    adversely impacted in its organizational capacity by having to expend significant resources to

5    address the challenged actions.

6              b.       The North Coast Builders Exchange represents 1,700 members active in

7    the construction industry in Northern California. The challenged ESA actions in Sonoma County

8    are having serious economic impacts on the Exchange's members. On the Santa Rosa Plain, the

9    construction industry has seen a 35% decline. This has reduced employment in the construction

10   trades. The delays in housing construction have increased the median price of a home in the area

11   by $30,000. These impacts will be exacerbated if the challenged actions remain in place, as 65%

12   of Sonoma County's growth is projected to occur within the CTS's footprint or range.

13             c.       Mead Clark Lumber Company supplies lumber for housing construction in

14   Sonoma County, CA. The ESA listing of CTSs caused the postponement or abandonment of 500

15   single-family homes last year in Sonoma County. This forced the termination of 20% of Mead

16   Clark's employees and caused economic injury to the company in lost sales.

17             d.       The Airport Business Center is a California limited partnership which has

18   approximately 114 undeveloped acres within the potential range of CTSs near Santa Rosa, CA.

19   The Business Center faces future economic costs and delay injuries traceable to the challenged

20   actions. Though the property is nearly four miles from the nearest CTS breeding site, FWS has

21   informed surrounding property owners of the need to complete lengthy and costly surveys to

22   determine the presence or absence of CTSs. The Airport Business Center faces similar costs and

23   delays for its future development, and for its share of costs when public agencies seek to provide

24   water supply and wastewater and transportation infrastructure.

25             e.       BH-PHI Partners is a California General Partnership d/b/a Rivendale

26   Homes, and is a homebuilder in Santa Rosa, CA. At several housing developments proposed by

27   Rivendale, FWS has insisted upon two-year studies to assess whether there are any CTSs on the

28   property, at a cost to Rivendale of over $650,000. In addition, Rivendale is incurring interest

crowell moring

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

1    carrying costs on the delayed projects, increased costs for entitlement fees, and other injuries. As

2    a result, while homebuyers are eagerly seeking affordable housing, the increased costs traceable

3    to the challenged CTS action make it impossible for Rivendale to provide new homes for many

4    families at prices they can afford.

5         f.    Bradley Land Company is a California company. It has 1,600 acres that

6    are in the process of being annexed into the City of Santa Maria. These lands are to be used for

7    future housing, schools, parks and recreational facilities. The listing of the CTS in Santa Barbara

8    County has imposed significant costs on Bradley Lands, including spending over $50,000 to

9    study the presence/absence of CTS on the site, incurring over $500,000 in planning fees, and

10    thousands of dollars in attorney fees. If CTS issues cannot be resolved, the total cost to the

11    company will easily exceed $1 million. Bradley Lands has also suffered delay damages due to

12    the lack of response from FWS as to how to process and what would be appropriate mitigation.

13         g.    Cobblestone Homes, Inc. is a homebuilder located in Santa Rosa, CA.

14    Cobblestone was a signatory to the April 16, 2003 notice of ESA citizen suit concerning CTSs in

15    Sonoma County. As a result of the challenged actions, Cobblestone is suffering economic

16    injury, including increased interest and carrying charges on three land parcels where housing

17    developments have been at least delayed. Even if these projects are ultimately authorized,

18    Cobblestone would bear additional costs from likely restrictions related to the CTS.

19         h.    The Northern California Engineering Contractors Association represents

20    125 companies and contractors adversely affected by the challenged actions in Sonoma County.

21    Many housing and other construction projects have been halted, delayed, and had cost increases

22    due to the challenged CTS actions. This creates a damaging and potentially threatening situation

23    for many of the Association's members to maintain healthy businesses in Sonoma County.

24         i.    Redwood Equities Investments, LLC; James Ratto; Dennis R. Hunter; and

25    Clement C. Carinelli have 850 undeveloped acres within the potential range of the CTSs in

26    Sonoma County. Over the past two years, they have spent $600,000 on surveys to determine the

27    presence or absence of CTSs on a portion of those lands. CTS issues also threaten the provision

28    of public services to this acreage.

8

1          j.      Ryder Homes of California is the managing entity for two limited

2    partnerships and an LLC (SW Santa Rosa Partners, LP; SWSR Associates, LLC; Bellevue Ranch

3    Phase 7, LP) that own zoned residential property in the southwest portion of the City of Santa

4    Rosa, Sonoma County, CA. Ryder's development of these projects has been delayed by two

5    years to conduct CTS surveys and provide other CTS information required by FWS and other

6    authorities. During this time period, the City of Santa Rosa has increased its development fees

7    by $12,000 to $15,000 per home, and imposes additional CEQA costs and time delays.

8          k.      Darwin E. and Janette T. Sainz are landowners in Santa Barbara County.

9    They have leased a portion of their property, but the lessee has not been able to conduct business

10   due the CTS listing. This has economically injured the Sainz's, as they have been unable to

11   lease an additional 200 acres. The Sainz's have lived with the CTS since 1980 and have

12   endeavored to share their land with the CTS. They believe that the set asides that FWS and

13   others have advocated since the ESA listing are unreasonable.

14         l.      Santa Rosa Associates II is a California limited partnership which owns

15   approximately 240 acres in the City of Santa Rosa. Such lands are a portion of the former Santa

16   Rosa Naval Auxiliary Air Station; significant portions of such lands are improved with former

17   concrete and asphalt runways, taxiways, aprons, and related rocky infield areas. Santa Rosa

18   Associates II is suffering delays in the sale and development of real property, and consulting and

19   other costs, due to the challenged ESA actions concerning CTSs in Sonoma County. These

20   injuries include, without limitation: (1) possible loss of the sale of real property to the Wright

21   Elementary School District, which involves possible loss of full development and related public

22   use of a new elementary school on such property; (2) increased costs for the Air Center East-

23   Phase II project, including possible expiration of the prior approval by the City of Santa Rosa of

24   the Air Center East-Phase II Tentative Map; and (3) delays in dedication of real property for a

25   neighborhood park site and possible loss of full use of adjoining neighborhood park previously

26   dedicated to the City of Santa Rosa.

27         m.      Schellinger Bros. has been building homes in Northern California for

28   more than thirty years. The listing of the CTS in Sonoma County has delayed all of Schellinger

9

1   Bros.' projects in that area, creating increased carrying costs in the hundreds of thousands of

2   dollars. Additionally, the challenged actions have forced Schellinger Bros. to hire consultants,

3   biologists, and attorneys to understand and meet the demands of the listing.

4         9.     The Plaintiffs include several entities involved in viticulture and other agricultural

5   interests. They consist of:

6             a.     Grower-Shipper Vegetable Association of Santa Barbara & San Luis

7   Obispo Counties. The Association was a signatory to the October 6, 2003 notice of ESA citizen

8   suit concerning CTSs in Santa Barbara County. Members of the Association have been unable to

9   conduct normal farming practices, including the tilling of soil and planting of crops, for fear of

10   disturbing lands potentially containing CTSs. This is particularly acute in the 7,334 acres in the

11   Santa Maria Valley that FWS has proposed as critical habitat for the CTS. *See* 69 Fed. Reg.

12   3064 (Jan. 22, 2004).

13             b.     Jackson Family Investments II, LLC ("JFI II"). JFI II was a signatory to

14   the October 6, 2003 notice of ESA citizen suit concerning CTSs in Santa Barbara County. JFI II

15   owns 5,444 acres in Santa Barbara County, a portion of which was leased to a third party for

16   vineyard development. Neither JFI II, nor its lessee, has been able to develop any portion of the

17   property because of the challenged CTS actions in Santa Barbara County. Given the current

18   restrictions, it is highly unlikely that the lease with the third party, which is subject to extension

19   at the option of the lessee in December 2006, will be renewed.

20             c.     A.F. and C.A. Fugler, Inc. is a family corporation holding agricultural

21   lands in Santa Barbara County. The land had been used for grazing. In 1997, water wells were

22   drilled at a cost of approximately $300,000. This allowed more productive, modern farming.

23   However, FWS has informed the Fuglers that the ponds they helped create have CTSs, and that

24   certain farming would violate the ESA.

25             d.     Mahoney Leasing leases a farm property in Santa Barbara County. Due to

26   the challenged DPS and endangered species designations of CTSs in Santa Barbara County, the

27   land cannot be farmed and cannot provide needed revenue.

28         10.    The Plaintiffs also include labor and other interest organizations. They consist of:

crowell moring
3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

1             a.     The Coalition of Labor, Agriculture and Business of Santa Barbara

2    County.  COLAB was a signatory to the October 6, 2003 notice of ESA citizen suit concerning

3    CTSs in Santa Barbara County.  COLAB represents over 1,000 members, many of whom have

4    been adversely affected by that challenged action.  The CTS listing has diminished the health of

5    the Santa Barbara economy.  The CTS listing has discouraged the conversion of rangeland to

6    cultivated agriculture during a time when productive agricultural lands are being lost to urban

7    expansion, thereby leading to less locally-produced food and higher food prices, and diminishing

8    land values as their agricultural potential cannot be realized.

9             b.     The Santa Maria Valley Chamber of Commerce represents 1,075 business

10    members.  The membership is diverse and ranges from one-person business operations to large

11    corporations.  The Chamber of Commerce was a signatory to the October 6, 2003 notice of ESA

12    citizen suit concerning CTSs in Santa Barbara County.  The ESA listing of those CTSs has

13    impacted the Chamber's members from the banking industry (which has seen a decline in

14    construction loans) to the building industry (which has suffered from inability to obtain permits),

15    to the Airport District (which has had development stalled) to the small businessperson who

16    relies on a healthy local economy.  These impacts continue to be felt, and can to date be

17    quantified in the millions of dollars.  Quality of life and economic injuries will continue in the

18    future, as local government's ability to create and maintain a healthy infrastructure (including

19    roads, water supplies, and wastewater capacity) are negatively impacted by the CTS listing.

20             c.     The Santa Rosa Chamber of Commerce represents 1,100 business

21    members, from one-person business operations to large corporations.  The Chamber of

22    Commerce was a signatory to the April 16, 2003 notice of ESA citizen suit concerning CTSs in

23    Sonoma County.  The ESA listing of the CTS in Sonoma County has presented economic

24    challenges to most of its members.  This ranges from the banking industry (which has seen a

25    decline in construction loans) to the building industry (which has suffered from inability to

26    obtain permits) to the small businessperson who relies on a healthy local economy.  The

27    economic impact of the CTS listing to date runs into the millions of dollars.  Quality of life and

28    economic injuries will continue in the future, as local government's ability to create and maintain

crowell moring

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

11

1  a healthy infrastructure (including roads, water supplies, and wastewater capacity) are negatively

2  impacted by the CTS listing.

3          d.      The Santa Maria Valley Economic Development Association promotes

4  rational economic development in the Santa Maria Valley area of Santa Barbara County. The

5  DPS and endangered species designation of CTSs in Santa Barbara County is having severe

6  economic impacts on members of the Association. The challenged actions are hindering

7  development, negatively influencing permitting processes, and creating unreasonable demands

8  on permit applicants. This includes obstructing  projects like the Industrial Development Park at

9  the Santa Maria Airport District, which is essential to future employment in the region. The

10  challenged actions also have contributed to a severe housing shortage.

11          11.     After *Bennett v. Spear*, 520 U.S. 154 (1997), many, and perhaps all, of the claims

12  in this case are APA claims challenging federal agency actions, rather than ESA citizen suit

13  claims. In an excess of caution, certain Plaintiffs described above provided Defendants with 60

14  days advance notice of the ESA claims in this Complaint in ESA citizen suit letters dated

15  April 16, 2003 (with respect to the DPS and "endangered species" determinations concerning

16  CTSs in Sonoma County) and October 6, 2003 (with respect to the DPS and "endangered

17  species" determinations concerning CTSs in Santa Barbara County). The remaining Plaintiffs

18  are Plaintiffs at least with respect to the claims not subject to 16 U.S.C. §§ 1540(g)(1)(A) or (C).

19          12.     Defendant Steven A. Williams is the Director of FWS. FWS is the Interior

20  Department agency which carries out the Interior Secretary's ESA duties. Former FWS Director

21  Clark and Acting FWS Director Hogan signed the DPS and "endangered species" determinations

22  contested in this case. FWS Director Williams is sued in his official capacity.

23          13.     Defendant Gale A. Norton is the Secretary of the Interior Department. The

24  Secretary of the Interior has the ESA authority to make DPS or "species" determinations and

25  ESA listing decisions with respect to non-marine species such as the CTS. *See* 16 U.S.C.

26  §§ 1532(15), 1533. Secretary Norton is sued in her official capacity.

27  / / /

28  / / /

crowell | moring
3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

1      14.    Defendant Steve Thompson is the Regional Director of FWS's California/Nevada

2    Operations Office in Sacramento, California.  That Office developed and supervised the actions

3    challenged in this case.  Mr. Thompson is sued in his official capacity.

4                        **REGULATORY BACKGROUND**

5        A.    **Background With Respect To The "Sparing" Use Of DPS Authority**

6      15.    The ESA is codified at 16 U.S.C. §§ 1531-44.  ESA § 4 provides that the

7    "Secretary shall by regulation . . . determine whether any species is an endangered species or a

8    threatened species."  16 U.S.C. § 1533(a)(1).  Thus, the ESA provides for designation of

9    endangered species and threatened species by the "species" unit.  The designation of "species" as

10   endangered species or threatened species is often referred to as "listing" and the designated

11   species as "listed species."  Under 16 U.S.C. § 1533(c), the Secretary maintains lists of

12   designated endangered or threatened species at 50 C.F.R. §§ 17.11 and 17.12.

13      16.    The ESA has an unusual definition of "species," which was limited by

14   amendments adopted in 1978.  As originally enacted, the 1973 ESA's definition of "species"

15   allowed the listing of any imperiled "group of fish or wildlife . . . in common spatial

16   arrangement."  87 Stat. 886 (1973).  In 1978, Congress eliminated the ability to list members of

17   the same biological species simply because they exist in any "common spatial arrangement"

18   (*e.g.*, all CTSs within a particular county).  Under the "species" definition adopted in the 1978

19   ESA amendments, the smallest unit that is eligible for further consideration for ESA listing is a

20   "distinct population segment of any species of vertebrate fish or wildlife which interbreeds when

21   mature" or DPS.  16 U.S.C. § 1532(16); 92 Stat. 3752 (1978).  Thus, "[l]isting distinctions below

22   that of subspecies or a DPS of a species are not allowed under the ESA."  *Ales Valley Alliance v.*

23   *Evans*, 161 F. Supp.2d 1154, 1162 (D. Or. 2001), *appeal pending* (9th Cir.); *accord NAHB v.*

24   *Norton*, 340 F.3d 835, 842 (9th Cir. 2003).

25      17.    The 1978 Congress "limited" the population listing authority to avoid trivializing

26   the ESA by "protect[ing] peripheral populations," especially because "many common species are

27   uncommon or rare at the edge of their range."  BEAN & ROWLAND, THE EVOLUTION OF

28   NATIONAL WILDLIFE LAW 200 (3d ed. 1997).  The primary researchers on CTSs have described

crowell moring

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

13

1  "Sonoma and Santa Barbara counties" as having only "outlier populations" of CTSs, while

2  Central California is the "main . . . portion of the range." Shaffer and Brenham, *Distinct*

3  *population segments of the California tiger salamander, Ambystoma californiense*, page 4

4  (Oct. 15, 2002). Hence, FWS ran afoul of ESA limitations in determining that CTSs at the

5  northern fringe of their range in Sonoma County and at the southern fringe of their range in

6  Santa Barbara County are significant enough to qualify as valid DPSs and to warrant separate

7  ESA protection.

8         18.    In 1979, the General Accounting Office ("GAO") expressed the concern that,

9  under a loose definition of "species," the ESA could be trivialized and the economic constraints

10  of the ESA unwisely imposed to protect units as small and insignificant as isolated "populations"

11  of squirrels in city parks:

12         [S]quirrels in a specific city park could be listed as endangered, even though an
        abundance of squirrels lived in other parks in the same city and elsewhere.... Such
13      listings could increase the number of potential conflicts between endangered and
        threatened species and Federal, State, and private projects and programs.... However, the
14      purpose of the Endangered Species Act is to conserve endangered and threatened species
        and their critical habitats, not preserve every individual animal and plant.

15

16  *Endangered Species – A Controversial Issue Needing Resolution* 52, 58 (GAO Rep. CED 79-65,

17  1979).

18         19.    Responding to the GAO Report, the Senate Report on the 1979 ESA Amendments

19  agreed there was a "great potential for abuse" in designating and listing DPSs. Accordingly, the

20  legislative intent is that the DPS authority be used only "sparingly and only when the biological

21  evidence indicates that the action is warranted." S. Rep. No. 96-151, at 7 (1979).

22         20.    FWS and the National Marine Fisheries Service (collectively, the "Services")

23  adopted a uniform DPS Policy at 61 Fed. Reg. 4722 (Feb. 7, 1996). The DPS Policy requires

24  that, for an alleged population to qualify as an ESA-listable "species" or DPS, it must be both:

25  (1) discrete, in terms of being "markedly separated from other populations of the same taxon";

26  and (2) significant, in terms of being "importan[t] to the taxon to which it belongs." 61 Fed.

27  Reg. 4725.

28         [The following] elements are considered in a decision regarding the status of a possible
        DPS as endangered or threatened under the Act . . . .

14

1.      Discreteness of the population segment in relation to the remainder of the species to which it belongs.

2.      The significance of the population segment to the species to which it belongs . . . .

*Significance*: If a population segment is considered discrete under one or more of the above conditions, its biological and ecological significance will then be considered in light of Congressional guidance (see Senate Report 151, 96th Congress, 1st Session) that the authority to list DPS's be used "* * * sparingly" while encouraging the conservation of genetic diversity. In carrying out this examination, the Services will consider available scientific evidence of the discrete population segment's importance to the taxon to which it belongs. This consideration may include, but is not limited to, the following:

1.      Persistence of the discrete population segment in an ecological setting unusual or unique for the taxon,

2.      Evidence that loss of the discrete population segment would result in a significant gap in the range of a taxon,

3.      Evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range, or

4.      Evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics.

61 Fed. Reg. 4725.

21.      The Services committed to apply the more policy-oriented "significance" standard "sparingly."

Congress has instructed the Secretary to exercise this authority with regard to DPS's "* * * sparingly and only when the biological evidence indicates that such action is warranted." (Senate Report 151, 96th Congress, 1st Session) . . . . The requirement that a DPS be significant is intended to carry out the expressed congressional intent that this authority be exercised sparingly as well as to concentrate efforts undertaken under the Act on avoiding important losses of genetic diversity . . . . The measures of discreteness and significance serve decidedly different purposes in the policy . . . . The interests of conserving genetic diversity would not be well served by efforts directed at . . . well-defined but insignificant units . . . . If a population segment is considered discrete under one or more of the above conditions, its biological and ecological significance will then be considered in light of Congressional guidance (see Senate Report 151, 96th Congress, 1st Session) that the authority to list DPS's be used "* * * sparingly" while encouraging the conservation of genetic diversity.

61 Fed. Reg. 4722, 4723-25 (Feb. 7, 1996) (preamble to DPS Policy).

22.      The Ninth Circuit found FWS's determination that the subset of cactus ferruginous pygmy-owls in Arizona was a DPS to be invalid under the "significance" standard of the DPS Policy, and to be an arbitrary, unsupported decision under the APA. *NAHB v. Norton*, 340 F.3d at 845-52. In particular, the Ninth Circuit found that the overall "significance" standard in the DPS Policy (the "significance of the population segment to the species to which it

15

1  belongs"), including all of the numbered "significance" considerations in the DPS Policy, focus

2  on the "significance" of the local population to the persistence of the species as a whole (the

3  "taxon"). The Ninth Circuit found that FWS acted arbitrarily in not explaining how the tests

4  required by the DPS Policy had been satisfied for the small Arizona population at the northern

5  fringe of the large international range of the more numerous pygmy-owl species. 340 F.3d at

6  844-45, 849, 852. Plaintiffs assert similar failings in the instant case.

7        23.    The CTS biological species has a widespread range. FWS's most recent estimate

8  is that CTSs exist in 22 to 25 counties in California on over 11 million acres of suitable habitat.

9  *See* 68 Fed. Reg. 28648, 28449-56 (May 23, 2003) (proposed rules to list another, third alleged

10  DPS of CTS which comprises the rest of the entire CTS species, and to change the status of the

11  alleged DPSs of CTS in Santa Barbara County and Sonoma County). The primary researchers

12  on CTSs have described "Sonoma and Santa Barbara counties" as having only "outlier

13  populations" of CTSs, while Central California is the "main . . . portion of the range." Shaffer

14  and Trenham, *Distinct population segments of the California tiger salamander, Ambystoma*

15  *californiense* 10/15/02 at page 4. These facts create a strong presumption that the outlier and

16  isolated CTS populations in Sonoma County and Santa Barbara County are not "significant" to

17  the survival and welfare of the biological species of *A. californiense*.

18        24.    The DPS Policy is binding because, "[h]aving chosen to promulgate the DPS

19  Policy, the FWS must now follow that policy." *NAHB v. Norton*, 340 F.3d at 852. Despite the

20  terms of the DPS Policy and the ESA legislative intent, the Services have not applied the DPS

21  Policy "sparingly" in practice. The "Services have concluded that potential populations qualify

22  as a DPS over 80 percent of the time." K. Geoffroy and T. Doyle, *Listing Distinct Population*

23  *Segments of Endangered Species: Has It Gone Too Far*, NATURAL RESOURCES & ENV'T 82, 84

24  (ABA Fall 2001). The "pace of DPS listings [has] climbed precipitously," with 39 DPS listings

25  between 1996 and 2000 and 20 more at some pre-final stage. *Id.*

26  / / /

27  / / /

28  / / /

crowell moring
3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

**B.    Background On FWS's Burden Of Persuasion On DPS And "Endangered Species" Determinations**

25.    Under the APA, "the proponent of a rule or order has the burden of proof." 5 U.S.C. § 556(d); *see id.* § 559 (APA applies to the ESA and other statutes unless expressly superseded). Thus, where FWS is the proponent of a DPS or "endangered species" determination, FWS bears the burden of persuasion. FWS must establish, by convincing affirmative evidence within the "best scientific and commercial data available" (16 U.S.C. § 1533(b)(1)), that: (1) a DPS exists under the DPS Policy's standards; and (2) that "species" unit is either "endangered" or "threatened" with extinction, within the meaning of ESA §§ 3 and 4 (16 U.S.C. §§ 1532, 1533).

26.    The ESA applies this allocation of the burden of proof to each stage in the normal petition and ESA listing process.

a.    When FWS becomes a proponent of listing, either on its own or in response to a petition, it assumes the burden of persuasion. To propose a listing, FWS must be able to conclude that the "petitioned action is warranted." 16 U.S.C. § 1533(b)(3)(B). To "warrant" is to "be sure of" or "to tell with assurance or positiveness" or "to guarantee." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1968). Hence, ESA listing of an alleged DPS would be "warranted" only if FWS could assure that the alleged DPS meets the ESA §§ 3 and 4 criteria for a "species" and is either an "endangered species" or "threatened species."

b.    To list, there must be an affirmative "determination as to whether a species is an endangered species" that is supported by the "best scientific and commercial data available." 16 U.S.C. §§ 1533(b)(1)(A) and (b)(6)(A)(i). If "there is not sufficient evidence to justify" a proposed listing, the ESA directs that FWS "shall immediately withdraw the regulation." *Id.* § 1533(b)(6)(B)(ii). FWS may find that ESA listing "is not warranted because of insufficient evidence to promulgate the proposed action." S. Rep. No. 97-418, at 14 (1982).

c.    Thus, the Services' published interpretation is that a species' listing is warranted only where that result is affirmatively supported by "convincing information." "If, at the end of a 12-month [status] review, convincing data on biological vulnerability and threat are

17

1   not available to support a proposal to list, a finding of 'not warranted' will be made."

2   *Endangered Species Petition Management Guidance* 13 (Services 1996).

3          d.       Even where there has been an emergency ESA listing to protect the status

4   quo temporarily, as occurred with respect to the alleged DPSs of CTSs in Santa Barbara and

5   Sonoma Counties, ESA § 4(b)(7) directs FWS to not adopt a long-term listing rule if "substantial

6   evidence does not exist to warrant such regulation." 16 U.S.C. § 1533(b)(7).

7          e.       The legislative and regulatory intent that alleged DPSs be found

8   "sparingly" is fulfilled only if FWS carries a high burden of persuasion. In *NAHB v. Norton*, the

9   Ninth Circuit essentially found FWS had not sustained that high burden of persuasion in a DPS

10   determination, where FWS's determination was based on "speculation." 340 F.3d at 847.

11          f.       The common element in all these contexts is that a decision in favor of

12   listing is legally sustainable only where FWS, in the preamble to the final listing rule, carries its

13   burden of showing that the biological evidence or data affirmatively demonstrate that a species is

14   imperiled. FWS "may not base its listings on speculation or surmise." *Building Industry Ass'n*

15   *of Southern California v. Norton*, 247 F.3d 1241, 1246-47 (D.C. Cir. 2001); *see Bennett v. Spear*,

16   520 U.S. at 176-77 (Congress ensured "that the ESA not be implemented . . . on the basis of

17   speculation or surmise" to "avoid needless economic dislocation produced by agency officials

18   zealously but unintelligently pursuing their environmental objectives").

19        **C.**       **Background With Respect To The Designation Of A "Species" As An**
20               **"Endangered Species"**

21       27.       The ESA defines an "endangered species" as "any species [*e.g.*, a DPS] which is

22   in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).

23   Similarly, ESA § 4 allows FWS to propose and finalize listings only where FWS can "warrant"

24   or assure that the "species is an endangered species or a threatened species," based on persuasive

25   evidence that "curtailment of its habitat" or some other "manmade factors" are imperiling the

26   species with extinction. 16 U.S.C. § 1533(a)(1).

27       28.       FWS did not sustain its burden of persuasion and unlawfully made DPS and

28   "endangered species" determinations for the subset of CTSs located in Sonoma County in a rule

crowell moring

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

18

1    adopted at 68 Fed. Reg. 13498 (March 19, 2003).  *See* Count I, below.  FWS did not sustain its

2    burden of persuasion and unlawfully made  DPS and "endangered species" determinations for

3    the subset of CTSs located in Santa Barbara County in a rule adopted at 65 Fed. Reg. 57242

4    (Sept. 21, 2000).  *See* Count II, below.

5        **COUNT I – ESA AND APA CLAIMS CONCERNING THE RULEMAKING LISTING**
         **THE ALLEGED DISTINCT POPULATION SEGMENT OF CALIFORNIA TIGER**
6        **SALAMANDERS IN SONOMA COUNTY AS AN ENDANGERED SPECIES**

7        29.    The allegations in ¶¶ 1-28 are incorporated by reference.

8        30.    FWS violated the ESA and the DPS Policy, and engaged in arbitrary and

9    inadequately explained actions, when it determined that the subset of CTSs located in Sonoma

10   County is a valid DPS and an "endangered species." 68 Fed. Reg. 13498 (March 19, 2003).

11       31.    FWS failed to respond to significant public comment on the proposed rules, as

12   required by the APA and ESA. 5 U.S.C. § 553; 16 U.S.C. § 1533(b)(8). Plaintiff Cobblestone

13   Homes, Inc., ("Cobblestone") filed detailed comments which showed that CTSs in Sonoma

14   County do not satisfy the "significance" standard of the DPS Policy. FWS conspicuously

15   avoided responding to Cobblestone's comments on the "significance" standard. *See* 68 Fed.

16   Reg. 13500-04. The two paragraphs on "significance" in the final rule's preamble merely repeat

17   the paragraphs from the preamble to the 2002 immediately-final emergency rule listing CTSs in

18   Sonoma County (except for the addition of the word "also"). *Compare* the "Significance"

19   paragraphs in 68 Fed. Reg. 13501 *with* those in 67 Fed. Reg. 47729-30 (July 22, 2002).

20       32.    FWS determined that the CTS population in Sonoma County meets the first,

21   "discreteness" standard in the DPS Policy because the "population is geographically isolated and

22   separate from other California tiger salamanders." 68 Fed. Reg. 13500. As the intervening lands

23   between CTSs in Sonoma County and those in 24 other California counties are inhospitable for

24   CTSs, there is no "natural interchange of individuals between the Sonoma County population

25   and other California tiger salamander populations." *Id.*

26       33.    FWS's application of the second, sparingly-applied "significance" standard of the

27   DPS Policy is more conclusory, and is arbitrary and unsupported:

28   ///

crowell moring
3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

19

1    The extinction of the Sonoma County population would result in the loss of a significant
     genetic entity and the curtailment of the range of the species. As discussed above, the
2    Sonoma County population is genetically distinct from other populations of California
     tiger salamanders. Loss of the Sonoma population would also eliminate the most
3    northern coastal extent of the range of the species. The Sonoma County population is
     geographically isolated. Genetic analysis of the species supports the hypothesis that no
4    natural interchange of the Sonoma County population occurs with other California tiger
     salamander populations.
5

6    68 Fed. Reg. 13501.

7        34.    This "significance" determination is invalid as it is contrary to the "significance"

8    standard in the DPS Policy and as FWS failed to provide a non-arbitrary rationale for its

9    determination. An agency's action is arbitrary if the agency "failed to consider an important

10   aspect of the problem, offered an explanation for its decision that runs counter to the evidence

11   before the agency," or lacks a "reasoned basis." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual*

12   *Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The ESA as well requires that any final listing rule "shall

13   include a summary by the Secretary of the data on which such regulation is based and shall show

14   the relationship of such data to such regulation." 16 U.S.C. § 1533(b)(8).

15       35.    Sonoma County is the extreme "northern coastal extent of the range" of CTSs and

16   CTSs in Sonoma County cannot naturally interbreed with the larger CTS populations in 24 other

17   California counties. 68 Fed. Reg. 13500. FWS has not demonstrated why this fringe population

18   on an exceedingly small portion of the species' habitat is so significant to the overall welfare of

19   the entire CTS species that it deserves DPS status and a separate ESA "endangered species"

20   listing. These facts logically support a conclusion that CTSs in Sonoma County are not highly

21   significant to the persistence of the species *A. californiense*. FWS's "significance" determination

22   is arbitrary because it does not address these important record facts.

23       36.    CTSs in Sonoma County satisfy none of the numbered "significance"

24   considerations in the DPS Policy (quoted above in ¶ 20). FWS's unsupported, contrary

25   conclusion is unlawful and arbitrary.

26           a.    FWS did not assert at 68 Fed. Reg. 13501 that Sonoma County is "an

27   ecological setting unusual or unique for the taxon" that satisfies "significance" Consideration 1.

28   CTSs exist in "coast ranges" in many counties. 68 Fed. Reg. 28649 (May 23, 2003).

20

crowell moring
3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

b.      FWS did not explain whether or how Consideration 2 – loss of the population "would result in a significant gap in the range of a taxon" that has "significance . . . to the species to which it belongs" – is satisfied. 61 Fed. Reg. 4725. FWS did state that the "extinction of the Sonoma population would result in . . . the curtailment of the range of the species" by eliminating a "geographically isolated population." 68 Fed. Reg. 13501. The curtailment of the range resulting from any local extinction of a more broadly-distributed species is not enough to satisfy "significance" Consideration 2. The "significance" standard is "decidedly different" from the reproductive isolation test for "discreteness" and seeks to avoid trivializing the ESA by protecting "well-defined but insignificant units." 61 Fed. Reg. 4724. FWS has not shown why the loss of this isolated grouping would have great "significance . . . to the species to which it belongs," as required by the DPS Policy and *NAHB v. Norton*, 340 F.3d at 844-52.

c.      A "significant gap in the range" refers to the loss of a DPS in a "'major geographic area' in the historical range" of the species or the loss of a "large percentage of the total number of taxon members." *NAHB v. Norton*, 340 F.3d at 847-49. However, Sonoma County cannot reasonably be described as "a major geographic area" in the CTS's range because: (1) Sonoma County is only 1 county out of 25 counties containing CTSs; and (2) using suitable habitat figures, Sonoma County contains less than 1% of the suitable CTS habitat. Nor does Sonoma County host a large percentage of the CTS population, as FWS's emergency and long-term listings of CTSs in Sonoma County were premised on the assumption that the population within the County was quite low. *See* 67 Fed. Reg. 47726, 47730 (July 22, 2002); 68 Fed. Reg. 13498, 13508 (March 19, 2003). Finally, Consideration 2 is satisfied only if FWS demonstrates a "significant gap" in the range that is significant to the persistence of the entire biological species. *NAHB v. Norton*, 340 F.3d at 345-50. Since CTSs in Sonoma County are geographically isolated from CTSs elsewhere, the hypothetical loss of CTSs in Sonoma County would not eliminate any current opportunity for migration and genetic interchange – hence, that hypothetical loss would have no great significance to the persistence of *A. californiense*.

/ / /

21

1      d.    FWS did not assert that CTSs in Sonoma County are "an introduced

2  population outside its historic range" within the meaning of "significance" Consideration 3.

3      e.    With respect to Consideration 4, FWS did assert that "extinction of the

4  Sonoma County population would result in the loss of a significant genetic entity." 68 Fed. Reg.

5  13501. However, FWS has not rationally explained why CTSs in Sonoma County are a

6  "significant genetic entity," in terms of being "significant" to the persistence of the taxon, as

7  required by both the DPS Policy and *NAHB v. Norton*, 340 F.3d at 852. *See* 61 Fed. Reg.

8  4724-25. A finding of some genetic differences cannot be sufficient to satisfy both the

9  discreteness and significance standards, or the significance standard adds nothing and is mere

10 surplusage. Yet, the "decidedly different" significance standard requires evidence of the

11 "significance of the population segment to the species to which it belongs," in terms of adding

12 some important adaptation that has "biological and ecological significance." 61 Fed. Reg.

13 4724-25. CTSs in Sonoma County fail that test, as they possess no known marked genetic

14 difference that provides an ecological or evolutionary advantage of significance to persistence of

15 the entire taxon.

16     37.    FWS, instead of addressing the "significance" considerations required by its own

17 DPS Policy, focused on matters that do not concern the "significance" of CTSs in Sonoma

18 County to the CTS species as a whole. For example, FWS offered various iterations that CTSs

19 in Sonoma County are reproductively isolated. 68 Fed. Reg. 13501.

20     38.    Thus, the outlier subset of CTSs in Sonoma County: (1) do not completely satisfy

21 any "significance" consideration; and (2) at most satisfy only a portion of Consideration 4. Even

22 meeting one out of four considerations is not enough when the DPS Policy is applied

23 "sparingly," as both Congress and the Services have directed. For example, FWS found that the

24 evidence did not demonstrate that the loss of northern fringe populations of western gray

25 squirrels in one out of four States created a gap in the range and loss of a gene pool that was

26 "significant" enough for the whole species under the sparingly-applied DPS Policy. 68 Fed.

27 Reg. 34637-39 (June 10, 2003). The "significance" determination with respect to CTSs in

28 / / /

crowell moring
3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

22

1    Sonoma County is arbitrary, as it is irreconcilable with the determinations with respect to other

2    alleged DPSs (*e.g.*, western gray squirrels).

3        39.    Because CTSs in Sonoma County are not a valid DPS or "species" unit eligible

4    for further consideration for ESA listing, their listing as an "endangered species" is unlawful

5    under the ESA.

6        40.    Even assuming *arguendo* that a valid DPS exists, FWS's "endangered species"

7    designation is contrary to the ESA and is arbitrary under the APA.  A preponderance of the best

8    scientific evidence does not show that the subset of CTSs in Sonoma County is in danger of

9    extinction throughout most of Sonoma County.  Instead of relying on biological "data" or facts,

10    FWS improperly listed CTSs in Sonoma County based on "surmise."  *Bennett v. Spear*, 520 U.S.

11    at 176.  The listing was premised on a series of assumptions that bad things might happen to

12    CTSs in Sonoma County unless they received ESA protection.  *E.g.*, 68 Fed. Reg. 13500 ("areas

13    of suitable habitat may be small" and "extinction of these [presumed] small units may be

14    common") (emphasis added).  As a result, the "endangered species" designation for Sonoma

15    County CTSs violates the ESA limitations to listing only where threatened or endangered status

16    is affirmatively supported by the "best scientific . . . data" (16 U.S.C. § 1533(b)(1)), "conclusive

17    data" in the case of a DPS (S. Rep. No. 96-151, at 7), or "convincing information. . . . [or] data."

18    *Endangered Species Petition Management Guidance* 13.  FWS violated ESA §§ 3 and 4 by not

19    finding that "substantial evidence does not exist to warrant" a long-term listing, and by not

20    "withdraw[ing]" the listing proposal.  16 U.S.C. § 1533(b)(7).

21        a.    "The total number of individual California tiger salamanders in Sonoma

22    County is not known."  68 Fed. Reg. 13500.  FWS has no credible scientific data that the

23    population of CTSs in Sonoma County is decreasing, let alone that the population is near a level

24    where it is in danger of extinction.

25        b.    FWS's surmise is that the amount of suitable habitat for CTSs in Sonoma

26    County has decreased over time, and this is an "appropriate method for assessing the status of the

27    species."  68 Fed. Reg. 13500.  FWS has not shown that the amount of suitable habitat (vernal

28    pools for breeding and nearby uplands for aestivation) has decreased to the point that the alleged

crowell moring

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

23

1  DPS is in danger of extinction. Instead, FWS admits that "[w]e do not have enough data to

2  determine what the [distribution and] size threshold for habitat might be, whereby any further

3  reduction would lower the quality of the remaining habitat." 68 Fed. Reg. 13500. Thus, with

4  respect to habitat, FWS unlawfully presumes that some critical threshold has been reached.

5        c.    The data FWS cited in the preamble to the final rule listing the alleged

6  DPS of CTS in Sonoma County as an endangered species show that there are 12 breeding sites at

7  two complexes which are "preserved" and "protected." 68 Fed. Reg. 13509. That preamble

8  provides no affirmative evidence that several other known breeding pools are likely to be

9  eliminated. Even using these artificially low figures, the redundancy and number of breeding

10  ponds are not the hallmarks of an "endangered species." For example, FWS recently found that

11  a DPS of the gray wolf was not endangered or threatened where two or three subpopulations

12  were substantially protected. 68 Fed. Reg. 15810 (April 1, 2003).

13        d.    The best available science suggests FWS has significantly undercounted

14  the available CTS breeding sites in Sonoma County. FWS's analysis of aerial photos suggests

15  there are "90" other water bodies in Sonoma County containing "potential suitable habitat." 68

16  Fed. Reg. 13504. Moreover, the CTS proposed rules that FWS published at 68 Fed. Reg. 28648

17  (May 23, 2003) describe the California Natural Diversity Data Base 2002 ("CNDDB") as the

18  best scientific data for CTS breeding sites. *See* 68 Fed. Reg. 28649, 28653-56. Utilizing the

19  CNDDB and other reliable information, Rana Resources concluded that there are 36 CTS

20  breeding sites and 64 locality observations of CTS in Sonoma County, not the 8 sites that FWS

21  has claimed. FWS has not provided substantial evidence showing how CTSs in Sonoma County

22  could be in danger of extinction when there are at least 36 to 90 breeding sites well distributed

23  across the suitable CTS habitat in Sonoma County for numerous subpopulations of CTSs.

24        e.    FWS's rationale for listing essentially is that federal, state, and local land

25  use controls have not protected and will not protect every acre of suitable habitat for CTSs in

26  Sonoma County. *See* 68 Fed. Reg. 13505, 13513-14 (the "Sonoma County California tiger

27  salamander is at risk from increasing fragmentation and isolation caused by urban development"

28  and "neither CEQA nor CDFG provide [*sic*] completely effective regulatory mechanisms").

*crowell* & *moring*

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

1    Assuming *arguendo* that this is true, it does not answer the critical question under the ESA:  even

2    if existing regulatory mechanisms are not 100% effective, is there persuasive evidence that those

3    regulatory mechanisms are so inadequate that they make CTSs in Sonoma County an

4    "endangered species" that is "in danger of extinction throughout all or a significant portion of its

5    range" in Sonoma County?  16 U.S.C. §§ 1532(6) and 1533(a)(1).  FWS failed to make a

6    persuasive case for a "yes" answer to the question required by the ESA's text.  As happened with

7    respect to the challenged critical habitat for the Alameda whipsnake, FWS's "endangered

8    species" determination cannot stand because FWS failed to answer questions required by the

9    ESA's text.  *See Home Builders Ass'n of Northern California v. FWS*, 268 F. Supp.2d 1197

10   (E.D. Cal. 2003).  And, FWS arbitrarily discounted or did not even address the impressive array

11   of regulatory controls (*e.g.*, California Department of Fish and Game requirements for 1:1

12   mitigation for development impacting CTS habitat; regulation under the Porter-Cologne Act and

13   Clean Water Act and California Environmental Quality Act; and local land use controls) and

14   land acquisitions discussed in comments on the proposed listing rule.

15          f.      Even if species' habitat or population levels have been reduced when

16   compared to pre-Columbian times, a species may remain quite viable and unimperiled.  *Cook*

17   *Inlet Beluga Whale v. Daley*, 156 F. Supp.2d 16, 21-22 (D.D.C. 2001); *see Center for Biological*

18   *Diversity v. Badgley*, 335 F.3d 1097 (9th Cir. 2003), *aff'g* 2001 WL 844399 at *13-21 (D. Or.

19   1991); 63 Fed. Reg. 35183 (June 29, 1998) (FWS decision against listing the alleged DPS of

20   northern goshawks in the western U.S. and decisions affirming FWS); 68 Fed. Reg. 7580

21   (Feb. 14, 2003) (similar FWS finding that the California spotted owl should not be listed under

22   the ESA as its habitat and population levels are now reasonably stable).  FWS arbitrarily

23   departed from these administrative precedents in finding that CTSs in Sonoma County are an

24   "endangered species" and violated the ESA.

25          41.     Thus, FWS listed the alleged DPS of CTSs in Sonoma County as an "endangered

26   species" without any direct evidence of a declining population that was in danger of extinction.

27   FWS employed speculation based on sketchy habitat information.  The correct response under

28   the ESA in this fact pattern is the response provided by the California Fish and Game

crowell moring
3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

25

1    Commission in 2002.  That year, the Commission rejected a petition from the Center for

2    Biological Diversity to list the CTS as an "endangered species" under the California Endangered

3    Species Act.  The petition was premised on generalized inferences from habitat losses similar to

4    those drawn by FWS.  The Commission found the general information on habitat decline

5    insufficient to demonstrate the existence of an "endangered species," especially because the

6    proponent of listing bears the burden of persuasion.

> The petition provides no actual data on California tiger salamander abundance. . . . The
> petitioners stress that it is more important to note that, in general, the number of
> California tiger salamanders must have been drastically reduced due the fact that the
> species cannot now be found in much of its hypothetical range and appears pushed into
> narrow bands of habitat.  However, the petition does not provide sufficient scientific
> information related to the actual abundance of the California tiger salamander. . . . The
> petition downplays the significance of absence of population data by focusing instead on
> the threats facing the California tiger salamander of "loss of habitat."  While habitat loss
> can often be an indicator of population declines and threat to the species, this petition's
> information about habitat loss was not compelling enough to overcome the other
> deficiencies in the data and analysis presented by the petitioners. . . . With some effort on
> the part of petitioners, there are a number of surveys and methodologies available that
> could provide more accurate scientific information on abundance and population trends
> of the California tiger salamander.

16   Fish and Game Commission: Notice of Findings, California Regulatory Notice Register 469, 471

17   (March 1, 2002, No. 9-Z).

18         42.    FWS also unlawfully altered, without the opportunity for public comment, the

19   rationale for finding that the "discreteness" standard in the DPS Policy had been satisfied.

20               a.    The preambles to the proposed rule and emergency listing designating

21   CTSs in Sonoma County as a DPS and an endangered species had relied heavily on "Shaffer *et*

22   *al*. 1993" and "Shaffer and McKnight 1996" regarding genetic discreteness, and cited those

23   studies as justifying "separate species recognition between the Sonoma County population and

24   other California tiger salamander populations."  67 Fed. Reg. 47729 (July 22, 2002).

25   Accordingly, certain Plaintiffs, consultants thereto, and other members of the public commented

26   on the limited nature of Dr. Shaffer's research and showed how FWS was misinterpreting that

27   science.

28   / / /

crowell moring
3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

1         b.    The preamble to the final rule admits that FWS erred in its interpretation

2    of the 1993 and 1996 reports. FWS retracted one earlier assertion, stating:

3         In the Discreteness section of the emergency rule, we incorrectly attributed the statement
     that Sonoma County tiger salamanders warrant taxonomic recognition to the 1996
4         publication. In fact, no Sonoma County tiger salamanders were sampled in the study
     (Appendix 1 of Shaffer and McKnight 1996).

5

6    68 Fed. Reg. 13503.

7         c.    The preamble to the emergency listing and proposed rule relied on

8    Dr. Shaffer's unpublished, 10-year old view (stated in 1993) that there is a 2% genetic difference

9    between *A. californiense* in Sonoma County and elsewhere in California. Certain commenters

10   obtained a third party review by Professor Lyman McDonald, Ph.D. and Bryan F. J. Manly, DSc.

11   They concluded that the 2% divergence criterion used to establish genetic discreteness is not

12   remarkable, let alone a sufficient basis to find that CTSs in Sonoma County are a DPS. FWS

13   reacted by abandoning the 2% rationale in the final rule. FWS moved to a new rationale that a

14   "phylogenetic tree" (prepared by Shaffer and Trenham in 2002 and purportedly submitted near

15   the end of the public comment period) allegedly showed that CTSs in Sonoma County are

16   discrete from those elsewhere in California. 68 Fed. Reg. 13501-04. FWS unlawfully and

17   arbitrarily switched to different scientific data and a new rationale (relying on a newly-

18   constructed "phylogenetic tree") which no member of the public was given an opportunity to

19   review or rebut. *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1401-06 (9th Cir.

20   1995) (FWS violated the APA in not subjecting a key scientific report to public comment; a new

21   public comment period was ordered). Thus, Plaintiffs were victimized by a "bait-and-switch"

22   maneuver. Plaintiffs were deprived of a real opportunity to comment on the data FWS ultimately

23   relied upon to establish the alleged "discreteness" of CTSs in Sonoma County.

24        43.    FWS withheld the phylogenetic tree and other crucial material until after the close

25   of the public comment period.

26        44.    Finally, while FWS based its "discreteness" determination on Shaffer and

27   Trenham's 2002 analysis of the data underlying their constructed phylogenetic tree for CTSs,

28   FWS did not have and apparently did not seek those data. FWS only had the conclusions the

1  researchers drew from those data in their unpublished submission. Without such data, FWS

2  could not ascertain whether the data support Shaffer and Trenham's conclusions, nor could the

3  public do so. Thus, FWS did not verify that its decision was affirmatively supported by the best

4  available science. Basing a listing decision on such missing data violates the ESA and is

5  arbitrary under the APA. *See Endangered Species Committee v. Babbitt*, 852 F. Supp. 32

6  (D.D.C. 1994).

7  **COUNT II – ESA AND APA CLAIMS CONCERNING THE RULEMAKING LISTING THE ALLEGED DISTINCT POPULATION SEGMENT OF CALIFORNIA TIGER**
8  **SALAMANDERS IN SANTA BARBARA COUNTY AS AN ENDANGERED SPECIES**

9       45.    The allegations in ¶¶ 1-44 are incorporated by reference.

10       46.    FWS violated the ESA and the DPS Policy, and engaged in arbitrary and

11  inadequately explained actions, when it determined that the subset of CTSs located in Santa

12  Barbara County is a valid DPS and an "endangered species." 65 Fed. Reg. 57242, 57243-44

13  (Sept. 21, 2000).

14       47.    FWS determined that CTSs in Santa Barbara County meet the "discreteness"

15  standard in the DPS Policy because they are a "geographically isolated" and "relict" population,

16  because there is "no mixing of the population with other California tiger salamander

17  populations," and because CTSs in Santa Barbara County have a unique gene pool and a

18  "morphological difference." 65 Fed. Reg. 57244.

19       48.    FWS's application of the sparingly-applied "significance" standard of the DPS

20  Policy is more conclusory, and is arbitrary and unsupported:

21      The Santa Barbara County California tiger salamander population is biologically and ecologically significant to the species. As discussed above, the Santa Barbara County
22      population is genetically distinct . . . . The Santa Barbara County population is also significant in that it constitutes the only population of California tiger salamanders west
23      of the outer Coast Ranges, and it is the southernmost population of the species. . . . The extinction of the Santa Barbara County California tiger salamander would result in the
24      loss of a significant genetic entity, the curtailment of the range of the species as a whole, and the loss of a top predator in the aquatic ecosystems that Santa Barbara County
25      California tiger salamanders inhabit.

26  65 Fed. Reg. 57244. This "significance" determination is invalid because it is contrary to the

27  "significance" standard in the DPS Policy and because FWS failed to provide a non-arbitrary

28  rationale for its determination.

crowell moring

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

crowell moring

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

49.    The CTSs in Santa Barbara County are only an outlier grouping at the extreme southern end of the CTS's range. This grouping cannot naturally interbreed with the larger CTS populations in 24 other counties. FWS has not shown why this fringe grouping is so "significant" to the overall welfare of the *A. californiense* that it deserves DPS status and a separate "endangered species" ESA listing. These facts logically support a conclusion that CTSs in Santa Barbara County are not highly significant to the persistence of the species *A. californiense*. The "significance" determination at 65 Fed. Reg. 57244 is arbitrary because it does not address these important record facts.

50.    CTSs in Santa Barbara County satisfy none of the numbered considerations of the "significance" standard in the DPS Policy (quoted above in ¶ 20). FWS's unsupported, contrary conclusion is arbitrary and unlawful.

a.    FWS did not assert at 65 Fed. Reg. 57244 that Santa Barbara County is "an ecological setting unusual or unique for the taxon" that satisfies "significance" Consideration 1. "None of the surveys and research conducted on the Santa Barbara population of California tiger salamanders over the past 25 years have [*sic*] indicated that this population has markedly different habitat requirements or life history traits than other California tiger salamanders." 65 Fed. Reg. 57246.

b.    FWS did not assert at 65 Fed. Reg. 57244 that Consideration 2 (loss of the alleged DPS "would result in a significant gap in the range of a taxon" which has significance to the entire species) was satisfied. Instead, FWS only stated the truism that loss of one geographically-described entity would result in "curtailment of the range of the species as a whole" (65 Fed. Reg. 57244). Since that is not the test stated in the DPS Policy, Consideration 2 has not been satisfied.

c.    FWS did not assert that CTSs in Santa Barbara County are not "an introduced population outside its historic range" within the meaning of "significance" Consideration 3.

d.    Consideration 4 addresses whether the "discrete population segment differs markedly from other populations of the species in its genetic characteristics" in a way

29

1   which has "biological and ecological significance" to "the species to which it belongs." 61 Fed.

2   Reg. 4725. While FWS did state that CTSs in Santa Barbara County have "marked genetic

3   differentiation" from other CTSs, FWS did not assert or explain why this has any ecological

4   adaptive significance to the CTS taxon as a whole. 65 Fed. Reg. 57244. A showing of

5   significance to the taxon is required under Consideration 4 as interpreted in *NAHB v. Norton*,

6   340 F.3d at 852. Properly and sparingly interpreted, this "significance" factor is not met.

7        51.     FWS, instead of addressing the "significance" considerations required by its own

8   DPS Policy, focused on matters that do not concern (let alone establish) the "significance" of

9   CTSs in Santa Barbara County to the CTS species as a whole.

10       a.     For example, FWS stated several times that "the Santa Barbara County

11  population is genetically distinct from other populations of California tiger salamanders, and

12  individuals exhibit genetic characteristics not found in other California tiger salamanders." 65

13  Fed. Reg. 57244. This might satisfy the "discreteness" standard. It does not satisfy the

14  "decidedly different" significance standard, which is designed to prevent the ESA listing of

15  "well-defined but insignificant units." 61 Fed. Reg. 4724 (DPS Policy). Since there is "no

16  mixing of the [Santa Barbara] population with other California tiger salamanders" (65 Fed. Reg.

17  57244), FWS has not rationally explained how any unique or different genes or morphological

18  characteristics of Santa Barbara salamanders have significance for the overall welfare of the CTS

19  species, given the absence of opportunities for natural genetic interchange. *See NAHB v. Norton*,

20  340 F.3d at 849 (the "significance" factor requires a rational showing of genetic "significan[ce]

21  'to the taxon to which it belongs'" and is not satisfied by preamble statements regarding the

22  significance to the DPS and "not to its taxon").

23       b.     Courts have interpreted the "significance" factor on a "significant gap in

24  the range" to refer to the loss of a DPS in a "'major geographic area' in the historical range" of

25  the species or the loss of a "large percentage of the total number of taxon members." *NAHB v.*

26  *Norton*, 340 F.3d at 848-49. CTSs in Santa Barbara County do not satisfy this factor since:

27  (1) Santa Barbara County is only 1 county out of 25 counties containing CTSs; (2) by far the

28  largest percentage of CTSs resides in the Central California portion of the CTS's range; and

30

1    (3) FWS's emergency and long-term listings of CTSs in Santa Barbara County were premised on

2    the assumption that the population there was quite low. *See* 65 Fed. Reg. 3096, 3098-99

3    (January 19, 2000); 65 Fed. Reg. 57242, 57252 (September 21, 2000).

4              c.    FWS asserts that loss of CTSs in Santa Barbara County would mean the

5    "loss of a top predator in the aquatic systems that tiger salamanders inhabit." 65 Fed. Reg.

6    57244. Because the DPS Policy speaks in terms of significance to the "taxon" or persistence of

7    the CTS species, the alleged significance of a vertebrate population for ecosystem stability is not

8    a dispositive factor. 61 Fed. Reg. 4723-24 (Feb. 7, 1996). FWS unlawfully relied on an

9    ecosystem significance factor that the DPS Policy proscribes.

10   52.    Thus, CTSs in Santa Barbara County: (1) do not completely satisfy any

11   "significance" consideration; and (2) at most satisfy only a portion of Consideration 4.

12   Accordingly, those CTSs are not a valid DPS. Because CTSs in Santa Barbara County are not a

13   valid DPS or "species" unit eligible for further consideration for ESA listing, their listing as an

14   "endangered species" is unlawful under the ESA.

15   53.    Even assuming *arguendo* that a valid DPS exists, FWS's "endangered species"

16   designation is contrary to the ESA and arbitrary under the APA. The listing was premised on a

17   series of assumptions that bad things might happen to CTSs in Santa Barbara County unless they

18   received ESA protection. *E.g.*, 65 Fed. Reg. 57246-61. As a result, the "endangered species"

19   designation of CTSs in Santa Barbara County violates the ESA limitations to listing only where

20   an endangered status is affirmatively supported by the "best scientific . . . data" (16 U.S.C.

21   § 1533(b)(1)), "conclusive data" in the case of a DPS (S. Rep. No. 96-151, at 7), or "convincing

22   information. . . . [or] data" (*Endangered Species Petition Management Guidance* 13). FWS

23   violated ESA §§ 3 and 4 by not finding that "substantial evidence does not exist to warrant" a

24   long-term listing, and by not "withdraw[ing]" the listing proposal. 16 U.S.C. § 1533(b)(7).

25             a.    FWS does not know the population trend for CTSs in Santa Barbara

26   County and does "not have an estimate of the size of the Santa Barbara population of California

27   tiger salamanders." 65 Fed. Reg. 57247. Without even a population "estimate," FWS possesses

28   / / /

crowell moring

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

1   no credible scientific data that the population of CTSs in Santa Barbara County is decreasing, let
2   alone that the population is near a level where it is in danger of extinction.

3           b.      Because FWS has no population trend data, FWS relied on the proxy that
4   some CTS habitat has been reduced. *See* 65 Fed. Reg. 57247-48, 57252-54. Yet, this proxy
5   would affirmatively indicate that CTSs are endangered or threatened only if FWS knew of a
6   critical minimum threshold for the number of vernal pools for breeding and the acreage of
7   nearby uplands for aestivation, below which the CTS is in danger of extinction. FWS did not
8   have this information at the time of the challenged listing. Thus, with respect to habitat, FWS
9   unlawfully presumes that some critical threshold has been reached.

10          c.      FWS issued an immediately-final emergency rule listing CTSs in Santa
11  Barbara County as an endangered species based on the supposition that there were only "14
12  documented breeding sites and associated uplands, half of which have been destroyed or have
13  suffered severe degradation in the last 18 months." 65 Fed. Reg. 3096 (Jan. 19, 2000). When
14  the public was finally consulted, FWS agreed in the final rule that there were "new ponds," that
15  the alleged Santa Barbara DPS was composed of six separately-interbreeding subpopulations,
16  and that one entire "metapopulation appears to be relatively free of significant threats and may
17  be protected through conservation easements." 65 Fed. Reg. 57247-48.

18          d.      By FWS's own admission, in 2000 it was known that 23 CTS breeding
19  ponds existed, providing substantial protection for six subpopulations of CTSs in Santa Barbara
20  County. *See* 65 Fed. Reg. 57252-53. FWS has not provided substantial evidence showing how
21  CTSs in Santa Barbara County could be endangered with extinction when there are at least 23
22  breeding sites well distributed across the suitable CTS habitat in Santa Barbara County for up to
23  six subpopulations of CTSs. This redundancy and number of breeding ponds are not the
24  hallmarks of an "endangered species."

25          e.      Many of these sites are substantially protected by voluntary efforts (such
26  as maintaining agricultural lands under the Williamson Act) and by regulatory constraints. CTSs
27  have persisted in Santa Barbara County despite the existence of intensive farming patterns (*e.g.*,
28  tilling for annual crops) since the early 1900s and the County's 20-year program of using lethal

crowell moring
3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
949 263-8400

1  chemicals to poison ground squirrels.  Hence, the alleged "threats" to the Santa Barbara CTS are

2  not recent, and the CTS's persistence indicates a hardy and adaptive (not endangered) species.

3        f.      FWS essentially argues that federal, state, and local land use controls have

4  not protected and will not protect every acre of suitable habitat for the Santa Barbara CTS.  *See*

5  65 Fed. Reg. 57255-57.  Assuming *arguendo* that this is true, it does not answer the critical

6  question under the ESA:  even if existing regulatory mechanisms are not 100% effective, is there

7  persuasive evidence that those regulatory mechanisms are so inadequate that they make the

8  alleged Santa Barbara Salamander DPS an "endangered species" that is "in danger of extinction

9  throughout all or a significant portion of its range" in Santa Barbara County?  16 U.S.C.

10  §§ 1532(6) and 1533(a)(1).  FWS's "endangered species" determination cannot stand because

11  FWS failed to answer questions required by the ESA's text.  *See Home Builders Ass'n of*

12  *Northern California v. FWS*, 268 F. Supp.2d 1197 (E.D. Cal. 2003).

**COUNT III – OTHER ESA AND APA CLAIMS**

14      54.    The allegations in ¶¶ 1-53 are incorporated by reference.

15      55.    In the CTS settings discussed above, FWS has applied the DPS concept in the

16  broad manner that Congress, the GAO, and the DPS Policy seek to avoid.  FWS's assertion that

17  subsets of salamanders in isolated breeding pools and counties are "endangered species" is

18  legally indistinguishable from the ESA listing of isolated populations of squirrels in different city

19  parks that Congress sought to avoid through the 1979 Senate Committee Report and that FWS

20  sought to avoid through the binding DPS Policy.  These broad applications of the DPS concept

21  are arbitrary.

22      56.    Consistent with the legislative and regulatory direction to apply the DPS concept

23  "sparingly" and as a last resort, the DPS Policy states that the "Services will continue to

24  generally accord [species and] subspecies higher priority [in listing] than DPS's."  61 Fed. Reg.

25  4725.  FWS violated this provision by: (1) not first considering the ESA listing of the entire CTS

26  species before embarking on separate rulemakings to list different alleged DPSs of CTSs that

27  collectively comprise the entire biological species; and (2) addressing the outlier populations

28  occupying peripheral habitat in Santa Barbara County and Sonoma County before considering

1  the majority of the CTS's population occupying most of the species' range.  FWS has acted

2  arbitrarily by engaging in five (really eight) rulemaking proceedings on one salamander species:

3  (1) an emergency rulemaking regarding the DPS determination for, and ESA listing of, the Santa

4  Barbara County DPS of the CTS (65 Fed. Reg. 3096 (Jan. 19, 2000)); (2) a proposed rule

5  regarding the DPS determination for, and long-term ESA listing of, the Santa Barbara County

6  DPS of the CTS (65 Fed. Reg. 3110 (Jan. 19, 2000)), and corresponding final rule (65 Fed. Reg.

7  57242 (June 12, 2001)); (3) an emergency rulemaking regarding the DPS determination for, and

8  ESA listing of, the Sonoma County DPS of the CTS (67 Fed. Reg. 47726 (July 22, 2002)); (4) a

9  proposed rule regarding the DPS determination for, and long-term ESA listing of, the Sonoma

10  County DPS of the CTS (67 Fed. Reg. 47758 (July 22, 2002)), and corresponding final rule (68

11  Fed. Reg. 13498 (March 19, 2003)); and (5) proposed rules regarding the DPS determination for,

12  and long-term listing of the remaining unlisted portion of the CTS (the alleged Central California

13  DPS), among other topics (68 Fed. Reg. 28648 (May 23, 2003)).

14  ## REQUEST FOR RELIEF

15  WHEREFORE, Plaintiffs pray that the Court:

16  1.    Declare that the DPS and "endangered species" determinations for the groupings

17  of CTSs in Santa Barbara County (65 Fed. Reg. 57242, 57243-44 (Sept. 21, 2000)) and in

18  Sonoma County (68 Fed. Reg. 13498, 13500-01 (March 19, 2003)) are arbitrary, unlawful, and

19  contrary to law;

20  2.    Grant the standard APA relief – that the "reviewing court shall . . . hold unlawful

21  and set aside" actions that are "arbitrary" or "otherwise not in accordance with law," 5 U.S.C.

22  § 706 – by setting aside the unlawful DPS and "endangered species" determinations of groupings

23  of CTSs in Santa Barbara County and in Sonoma County;

24  3.    Grant the standard injunctive relief in an ESA citizen suit under 16 U.S.C.

25  § 1540(g) by enjoining Defendants to terminate the "endangered species" listings of, and DPS

26  determinations for, CTSs in Santa Barbara County and in Sonoma County; and

27  / / /

28  / / /

4.    Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

*Steven P. Quarles*                                    *Steven P. Rice*
                                    by SPRice

Steven P. Quarles                          Michael D. Newman (State Bar No. 152789)
J. Michael Klise                           Steven P. Rice (State Bar No. 094321)
Thomas R. Lundquist                        CROWELL & MORING LLP
CROWELL & MORING LLP                       3 Park Plaza
1001 Pennsylvania Avenue, NW               20th Floor
Washington, D.C. 20004-2595                Irvine, CA 92614-8505
Phone:    202-624-2667                     Phone:    949-263-8400
Facsimile: 202-628-5116                    Facsimile: 949-263-8414
tlundquist@crowell.com                     srice@crowell.com

Attorneys for Plaintiffs Home Builders Association of Northern California; Blochman Union School District; Burbank Housing Development Corporation; City of Rohnert Park, CA; City of Santa Rosa, CA; Santa Maria Public Airport District; Airport Business Center; Bellevue Ranch Phase 7, LP; BH-PHI Partners a California General Partnership d/b/a Rivendale Homes; Bradley Land Company; Clement C. Carinelli; Coalition of Labor, Agriculture and Business of Santa Barbara County; Cobblestone Homes, Inc.; A.F. and C.A. Fugler, Inc.; Grower-Shipper Vegetable Association of Santa Barbara and San Luis Obispo Counties; Dennis R. Hunter; Jackson Family Investments II, LLC; Mahoney Leasing; Mead Clark Lumber Company; North Coast Builders Exchange; Northern California Engineering Contractors Association; James Ratto; Redwood Equities Investments, LLC; Ryder Homes of California; Darwin E. and Janette T. Sainz; Santa Maria Valley Chamber of Commerce; Santa Maria Valley Economic Development Association; Santa Rosa Associates II; Santa Rosa Chamber of Commerce; Schellinger Bros.; SW Santa Rosa Partners, LP; and SWSR Associates, LLC

1081670   (Cam No. 100026.001)

35